GARDNER, *appellant*, and GARDNER and others, *respondents.*

A *feme covert* may contract a debt in regard to her *separate estate*, and may even become the *debtor of her husband*, for money borrowed of him to improve such estate ; and payment of the debt thus contracted will be enforced *in equity* as a *lien* upon the estate, unless by the terms of the donation the *feme* be prohibited from charging the estate.

A debt thus contracted by the *wife*, may be discharged by a *donatio causa mortis*, as by the declaration of the husband *that the money was her's*, and by *destroying the bond*, the evidence of the debt.

If from the circumstances of the case there be reason to doubt the competency of the husband *to dispose* of his property, on the question coming before the chancellor, it seems a *feigned issue* should be awarded to try the question.

The incidental power of the court of chancery to award an issue is not affected by the provisions of the revised statutes on the subject of feigned issues in certain specified cases.

Long continued inebriety, although resulting in occasional insanity, does not require proof of a lucid interval to give validity to the acts of the *drunkard*, as is required where *general insanity* is proved on a question of *devisavit vel non*. Where the indulgence has produced *permanent derangement of mind*, it would be otherwise, *it seems*.

The act of a party addicted to intemperance, in disposing of his property, will not be invalidated on the ground of *undue influence* exercised over him by the inmates of his family, where the influence arises from kind offices springing from attachment or affection ; to vitiate the act, the influence must be shown to have arisen from *threats, force* or *coercion*, destroying free-agency, and the boon to have been obtained by such coercion, or by *importunity* that could not be resisted—producing compliance for the sake of peace.

APPEAL from chancery. The appellant CHARLOTTE GARDNER who was the administratrix with the will annexed of the estate of her late husband JAMES GARDNER, was cited to render an *account* before the surrogate of the city of New York of her doings as administratrix, upon the application of a nephew of the testator to whom and four brothers and one sister of the applicant, a *moiety* of the personal estate of the testator was given by the will. When Mrs. Gardner rendered her accounts to the surrogate she *stated* to him, that she had borrowed $2000 of her husband to complete or erect buildings on property at Williamsburgh, deeded to her or her trustee for her use, having

made several purchases of lots. No mention of this trans-
action was made in the *accounts*, nor in the *objections* to the
same, filed by the now respondents. Auditors were ap-
pointed, and on the hearing before them, it appeared in evi-
dence, that Mrs. Gardner received an income from Eng-
land which was secured to herself, and that she was the
owner of real estate at Williamsburgh, holding it as her
separate estate. The sum of $2000 was lent to her in
1827, for which sum she executed her bond. Her husband
was very intemperate and had been so since 1815. In
1825 he became insane and was confined in the lunatic
asylum, where, with a short interval, he remained until
the spring of 1826 ; was taken there again in 1828, and
early in 1829 came away entirely restored. In July, 1825
he made his will. About the first day of March, 1829,
four months previous to his death, Gardner sent to a Mr.
Williams with whom the bond of his wife had been de-
posited, and on obtaining it, told her *that the money was
her's* and put the bond in the fire. The evidence as to
the sending for and destruction of the bond rested solely
upon the testimony of Mrs. Milnor, a daughter of Mrs. Gard-
ner, by a previous marriage, who was dependent upon her
mother for support. She further testified that upon a pre-
vious occasion, after Gardner left the asylum the last time,
she was present when *Gardner* sent for Mr. Williams to
his bed side, and told him if any thing happened to him, to
destroy those papers. She also testified that on the day the
bond was sent for, and previously to its being sent for,
Gardner requested his wife to destroy the papers if any
thing should happen to him. This she declined to do, and
the papers were then sent for. On the part of the now
respondents it was shewn that a petition was presented to
the chancellor for the removal of *James Gardner*, from an
appointment, which he held as *guardian* of the estate of an
*infant*, on the ground of his *insanity ;* that on the *fifth* day
of *March*, 1839, the chancellor referred the petition to a
master for inquiry into the facts; that on the eighteenth,
nineteenth and twentieth day of the same month, proofs
were taken by the master, and that on the coming in of the

master's report, Gardner was *removed* from his trust as guardian. On this evidence the auditors made a report charging Mrs. Gardner with the $2000. On the coming in of the report, the counsel for the administratrix insisted before the surrogate, that no foundation was laid in the objections filed to the accounts, to support the charge of the $2000 against her; no issue was offered to which proofs could be applied, and no claim presented *specifically* in that respect, which the surrogate by a decree could reject or allow. The objection was overruled and the report confirmed by the surrogate, whose decree was *affirmed* on appeal by the CHANCELLOR, 7 *Paige*, 512. The administratrix thereupon appealed to this court, where the case was argued by

*M. T. Reynolds*, for the appellant.

*J. Rhoades & S. Stevens*, for the respondents.

After advisement, the following opinion was delivered :—

By COWEN, J. The main objection here, is, that Mrs. Gardner was not chargeable with the $2000 which she had borrowed from her husband. *First :* It is said she was not liable, because the loan was by the husband to his wife. It is admitted to be void at law, upon the ground that the wife cannot contract a debt to any one, and especially to her husband. This rule is universal at law, and it is the general rule of a court of chancery, which follows the law. *Simpson* v. *Simpson*, 4 *Dana*, 140. Chancery, however, has raised an exception : not an exception in terms, but yet a substantial one. If the wife holds an estate separate from, and independent of her husband, as she may do in equity, chancery considers her in respect to her power over this estate a *feme sole*, 2 *Kent's Comm.* 164, 3*d ed.* ; and, although she is still incapable of charging herself at law, and equally incapable in equity of charging herself *personally* with debts, yet I think the better opinion is that separate debts contracted by her expressly on her own account, shall in all cases, be considered an appointment or

Gardner v. Gardner.

appropriation for the benefit of the creditor, as to so much
of her separate estate as is sufficient to pay the debt, if she
be not disabled to charge it by the terms of the donation.
Chancery, then, considers the debt as a valid charge *pro
tanto*, or will at least enforce its collection specifically, by
fixing it as a lean upon the separate estate. 2 *Story's Eq.*
627, § 1399 to 1401, *inclusive and the cases there cited.* 2
*Kent's Comm.* 164, 3*d ed. id.* 166. I see no objection in
this theory to a debt being contracted by the wife directly to
the husband. Such a power seems to have been recognized
in *Heatly* v. *Thomas*, 15 *Ves.* 596, wherein it appeared that
the wife had given her husband a bond of indemnity. The
case is equally within the principle, whether we consider her
acting as feme sole, or under a power of appointment in fa-
vor of her husband.

In answer to this view of the question, the argument of
*policy* is insisted on. It is said that the principle will give
an opening to the exercise of undue influence by the hus-
band, in procuring this equitable mortgage. That may be
so. Such an influence is perhaps too often exerted in va-
rious indirect legal methods of acquiring the wife's estate.
But the power of restraint lies with the donor. If he give
the estate to the wife unshackled as to the mode of aliena-
tion, he avows himself willing to repose upon her discre-
tion; and run the risk of her husband's influence. If the
donor be distrustful of either, his business is to interpose
such guards in respect to the occasions and the forms of
alienation as shall obviate the supposed danger. When the
wife holds her separate estate untrammelled by any such
precautionary control, it is right that such estate should be ap-
propriated to the payment of her separate debts. And this
is especially so where, as in the case at bar, they are con-
tracted for the benefit of her separate estate. I say *as in the
case at bar.* Such was Mrs. Gardner's object in obtaining
the loan, as she admitted before the surrogate. She had, no
doubt, stated the object to her husband, viz. the improving
of her estate at Williamsburgh; and I, for one, cannot
agree with her learned counsel in saying that her declara-
tion must be presumed to have been falsified by her con-

Gardner v. Gardner.

duct; that she probably deceived her husband, even admitting the truth of her declaration, is to be regarded as a matter of mere abstract moral obligation. And above all, if the counsel be correct in supposing that an application of this money to the proposed improvement were essential to secure its reimbursement, I think the chancellor was bound to presume that she had not misapplied it, at least until the contrary was shown. It was no more than saying she shall be presumed to have acted honestly. If the declaration of her purpose be considered as made to the surrogate only, a thing not very probable, it was in no way qualified with a suggestion that the purpose had not been fulfilled. I feel quite clear, therefore, that a valid loan was established by the proof, chargeable on the appellant's trust estate, which it became her duty as administratrix to account for, if it were collected or collectable intermediate her appointment as administratrix and her accounting, unless the debt was discharged by her husband.

Secondly. It is said, that she is not to be made liable inasmuch as it was not shown that the debt had been collected, or might have been collected with ordinary diligence. Direct evidence of actual collection is not pretended; and it is insisted that the debt was not even shown to have been separate. Mrs. Gardner herself admitted that the $2000 was loaned with a view to employ it in the erection of buildings at Williamsburgh, on her property which lay there; and this did not constitute the whole of her separate estate. I think it is not too much to presume that the property which the $2000 was destined to improve, bore such a reasonable proportion in value, as to call for the improvement; and that, in whatever mode the sum may have been invested for her use, the whole, investment and all, would form a fund perfectly adequate to the reimbursement of the money. That is but presuming an exercise of due discretion in the improvement of her estate. Ordinary prudence is to be presumed till the contrary be shown; and in this case, the contrary was not even pretended. Ordinary diligence in collecting, and therefore actual collection, might also have been inferred by the auditors, and Mrs. Gardner be holden

Gardner v. Gardner.

liable on that ground. At any rate, it was by no means straining a point to say, that, after a lapse of time, she ought to have collected the debt from a fund sufficient in itself; and probably, in a great measure, under her personal control. If the contrary of all this were true, why was that not shown by her? The presumption was not conclusive against her.

I have thus far gone through with several branches of the argument submitted to us by the counsel of the appellant, because I did not know how far the members of the court would agree with me in respect to another branch of it, still ranging under the main point in the cause. On that I have felt myself constrained to agree with him; and should the court think with me in the view which I have taken of it, they will perceive that the appeal is well founded.

*Lastly*. It was said that the testator, in his life time, forgave Mrs. Gardner the debt in question, by procuring and burning the bond which was taken as evidence of it. The only direct proof of this fact is derived from the deposition of Mrs. Milnor, the daughter of the appellant, and the stepdaughter of the testator, who, as I infer, was either a resident in the testator's family, or very often with them, from 1827 when she says the loan was made, to February or March, 1829, when she says the bond was destroyed. The testator died in July next ensuing. She says that he at first kept the bond himself, but when he got sick he gave it to Mr. Williams, with instructions that, if any thing happened to him, the testator, he, Mr. Williams, should destroy it. He afterwards told Mrs. Gardner to destroy it, if any thing happened, which she declined. He then sent for the bond, and himself committed it to the fire, telling Mrs. Gardner that the money was hers.

I have not been able to read Mrs. Milnor's deposition without the impression that the chancellor appears to have entertained, viz. that the bond was in truth destroying by the testator, with the intent to forgive this debt: nor have the collateral facts, which are supposed to furnish marks of fabrication on the part of the witness had the effect to weaken my impression. The strongest of these facts is an alleged

want of recollection by the witness, of the person by whom the testator sent to Mr. Williams for the bond; as if she might fear contradiction from risking a disclosure of the name. But beside omitting to say that she even saw the messenger, she names Mr. Williams, who might have contradicted her in several important particulars, if she spoke untruly, and whose non-production by the legatees is entirely unaccounted for. That a family transaction of this kind should have been witnessed only by the family, is of all things the most natural; and it is not surprising that the only witnesses were the mother and daughter, whose offices were at that time important about the person of the testator. He had no children of his own, and was not on the best terms with his brother, to whose children he bequeathed a portion of his estate. He appears to have entertained sentiments of great kindness for the witness, to whose son he had conveyed a small tenement; and towards his wife, the appellant, to whom he bequeathed one half of his *personal* estate. His will had been made in 1825; and having, perhaps, lived in some measure upon her bounty; and at any rate been the cause of much trouble and mortification to her by his habits of intoxication, it is not strange that, in the interval of recollection which seems to have returned upon him, he should have thought the scanty provision in his will unequal to the demands upon his gratitude and his kindlier feelings. With a competency of her own, on which she might have separated from him, she had forborne to do so; and, by taking care of him, had given an earnest of disinterested affection sufficient to account for the destruction of the bond upon principles far other than those of *undue influence.* That he himself was childless, that his wife's daughter was a pensioner upon the bounty of her mother, and the family of his brother, the respondents, had been in some measure alienated, even if it were by his own fault, furnished perhaps an additional motive, which we have no right to question. Such a concourse of circumstances coming in aid of Mrs. Milnor's narrative, to my mind much more than counterbalances the criticisms founded on her relationship to the respondent, or interest in adding to her mothers's means of

kindness to herself. As the gift of the debt was in nature of a testamentary disposition, it is undoubtedly right that we should look to the motives which argue the fitness of the act, both as a test of its probability and sanity.

The chancellor seems to have entertained great doubt of the testator's sanity, and assuming that the bond was destroyed with the intent imputed, he presumed that the wife or some one else had persuaded the testator to that act, he not being at the time of sound and disposing mind and memory, or being at least open to the assaults of undue influence. I entirely agree to adopt the test proposed by the chancellor; if the testator was unfit to make a codicil, he was equally unfit to forgive the debt. The proof on that subject is, that he was an intemperate man, and had been so from 1815 to 1829, some 14 or 15 years, though Mrs. Milnor says he was never out of his senses till 1825. His derangement at this time could not have amounted to any very serious disqualification : for in that year he made a very judicious will, in which all parties acquiesce. In the course of the ensuing four years his fits of drunkenness became more frequent, his intemperance had grown into a confirmed habit, and his constitution was found to be gradually giving way, notwithstanding the efforts of his friends to break the habit. He was twice confined in the lanatic asylum, which I understand to have been among the expedients resorted to for the purpose of checking his career of drunkenness. I read of no insanity among the proofs except what arose from the excessive use of ardent spirits. I lay no stress on his being removed from the office of *guardian,* because I think any master in chancery would report in favor of removing an intemperate man from such a place, though he were yet far short of insanity. That he had surrendered the management of his property and business to his wife, was evidence either of unusual discretion on his part, or of a salutary influence on hers. I cannot deny that, in the words of the chancellor, the testator was a broken down inebriate ; nor that such a man might be entirely unqualified to make a will. Reason might have been dethroned, memory might have lost its seat, and the man have been

reduced to the condition of a mere driveller ; but ordinarily this is not so.   To whatever extent the constitution may be physically impaired by intemperance, the mind retains sufficient strength for the purpose of transacting common business, when not clouded by actual intoxication.   Cases were cited at the bar, that if *general insanity* be established, it will be presumed to continue, unless a lucid interval at the time of the transaction in question be clearly shown ; but does proof that a man is in the habit of often getting drunk, and has even been a drunkard for years, make out a case of general insanity within the rule ?  The greatest drunkard is frequently sober, perhaps every day ; his habit is in a degree under the control of himself and his friends ; and during the few months that this man spent in the lunatic asylum, the *mad-house*, as it has been called by way of emphasis, he was no doubt entirely sober and therefore sane.   If his unfortunate indulgence in the use of ardent spirits had resulted in a settled derangement of mind, independent of the immediate influence of drink, (and if the proof comes short of this, a case of *general insanity* is not established,) why was nothing of that kind shown or attempted to be shown at the hearing?   Why was not the family physician called ? General sanity is the natural and ordinary condition of the mind, and is to be presumed till the contrary is established.

But we are not left to presumption.   Mrs. Milnor says that about a month before the bond was destroyed, she and her mother having received word that the testator was *perfectly himself*, went and brought him home from the asylum, whither he had been for the last time.   He soon after told Williams to destroy the bond, and finally sent for it and destroyed it himself, being perfectly sane of mind ; in the phrase of the witness, *he was entirely himself ;* he was not very well ; but only weak.   I do not find a word of proof that after he returned home the last time, his mind was unsettled, or that he had even relapsed into his accustomed indulgence.   His whole conduct in making the gift, as sworn to, bears strong marks of deliberation ; and the transaction is, in its own character, an argument in favor of sanity.   If there were in truth the power of malign influ-

ence on the part of the wife, and a disposition to abuse the power, why was it not exerted in a total alteration of the will ?   Why suffer any part of the estate to pass to the respondents ?   They had stood in the will for *half* the personal estate, ever since 1825 ; the one half only having been bequeathed to the wife.   The destruction of the bond was the addition of only $1000 more ; for the will already carried one half of the bond to her.   What more natural, I ask, than that, in a long turn of perfect sobriety, confined by bodily weakness with his family, he should review the four years which had elapsed since his will had been made, the care, the anxiety, the shame which his unfortunate appetite had in the meantime inflicted on his wife ; and see the fitness of adding at least this meagre and disproportionate codicil ? Is there the least difficulty in accounting for such an act, without raising the hypothesis of insanity, or of undue influence ?

In turning over the books with a view to the form of this gift, I was struck with its similarity, in several respects, to a case which came before Lord Hardwicke in 1740 ; *Richards* v. *Syms, Barnardist, Ch. Rep.* 90.   There the defendant borrowed £3000 of the complainant's father, giving a bond and mortgage.   The defendant's mother was uneasy on account of his contracting so heavy a mortgage debt ; but the mortgagee told her in her son's presence, that she need not be uneasy, as it was in his power to be kind to her son.   The bond and mortgage were kept for some time by a trustee ; but the defendant procured them from him, and brought them in a box to the mortgagee's house, where the mother was, and requested him to take and keep them himself.   Upon this, as it was sworn on the part of the defendant, the mortgagee put back the bond and mortgage with his hand ; and said " take back your writings : I freely forgive you the debt."   Turning to the mother, he said, " I always told you I would be kind to your son ; now you see that I am as good as my word." But this evidence was contradicted on the part of the complainant, who was the mortgagee's son and heir.   Lord Hardwicke held that, taking the case as made out on the

part of the defendant, the gift discharged both the bond and mortgage. But inasmuch as the contradictory evidence left it doubtful whether the mortgagee did make the expressions imputed to him, his lordship directed an issue on that question. In the case at bar, which is an appeal from a surrogate, I am not aware of any express statute giving the chancellor power to award an issue, as is done by the revised statutes in certain cases while before the surrogate or before a circuit judge in probate cases; but the appeal is given, in the case before us, to the *court of chancery*, as such. 2 *R. S.* 506, 2*d 'ed.* And the reason why the legislature were silent, was probably, because they knew that the court of chancery has the general incidental power to award an issue in all proper cases. I have no doubt of its power in the case before us, if not expressly restrained; and I presume its jurisdiction is not, in regard to issues, narrowed any where in the revised statutes. Taking the court of chancery to hold its ordinary power in this particular, and conceding, for the sake of the argument, that Mrs. Milnor's testimony was shaken, then, I think much the better course would have been to award an issue. The case at bar seems more strikingly to call for such a direction previous to a decision by the chancellor, than that of *Richards* v. *Syms*, where the evidence was agreed to be contradictory. The Lord Chancellor would not pronounce against the gift even in such a case, till the defendant's testimony had been overruled by the verdict of a jury. In the case at bar, I have endeavored to show, that there is, at least, very great difficulty in seeing a doubt either in respect to the form and intent of the gift, or the sanity of the donor or his freedom from undue influence. Yet the court of chancery has nullified the gift, without even taking the opinion of a jury. If, as was held by Lord Hardwicke, the intent to give ought not to be negatived without an issue in *Richards* v. *Syms*, such a precaution in the case before us, even if we do not go beyond an inquiry as to what the testator said, seems to me still more proper. But when we come to doubt on the question of insanity and undue influence, such a case has always been deemed peculiarly prop-

er for the consideration of a jury. I noticed before, that the gift was in nature of a bequest. The question is of the same character as that which frequently arises on offering a will for probate, in respect to which the legislature have made special provisions for an issue on appeal to the circuit judge. 2 *R. S.* 10, 505, *2d ed.* It is analogous to the issue of *devisavit vel non,* so familarly known to the profession. Mingled, as this matter was before the auditors, with the general account, and introduced by the way of supplemental charge at an advanced stage of the hearing, (though I do not mean to deny the regularity of that course in strict practice,) it is easy to perceive that the hearing must have been greatly wanting in that fulness of preparation, and singleness of attention, and thorough examination peculiar to the trial of a feigned issue. May I be permitted to say again that, to my mind, there was an unaccountable paucity of proof to show insanity? In *Kettletas* v. *Gardner,* read in evidence from 1 *Paige,* 488, the master reported that Gardner *was of sound mind* when the report was made, though his bodily health was impaired and his habits of intemperance laid him open to frequent attacks of insanity. It is evident from the report that the *fits of insanity* spoken of were entirely *voluntary;* the man got drunk often and that was the amount of his insanity. The report was made in 1829, after he had come from the asylum the last time, a sober man, as Mrs. Milnor says; nor was there a particle of evidence, that he was even drunk after that time. The amount of the master's report is that he was *liable* to become insane. That he ever became so after he left the asylum he does not say and when he destroyed the bond he was, as Mrs. Milnor says, *perfectly himself.* She had been long acquainted with him, and could doubtless tell as a matter of fact at the time, whether he was drunk or sober. It must have been a surprise to this widow to be told that her husband who had been in the habit of getting drunk could not, for that reason, make a codicil, or add to her legacy by way of *donatio causa mortis,* when he was perfectly sober. I feel fully authorized to believe that there was nothing in the case different from the ordinary

alternations of an intemperate man. That his habit had at any time resulted in *delirium tremens* is no where said. Even that, the worst and commonly the most imbecile state of the drunkard, is often attended with turns of sobriety sometimes for weeks. Again, I ask if there was any thing more than common drunken fits, why was it not shown? Doct. Rogers had advised that he should be confined. Why was the doctor not examined? Mrs. Gardner had raised the issue. Her own witness had pronounced the man sober at the very moment of the gift; and also declared that he came from the asylum, on an invitation to fetch him as a cured man. If she was mistaken in her estimate of his condition, she might have been met by a cloud of witnesses; the physicians at the asylum, the keeper and his agents, in addition to the family physician, and the neighbors who had noticed him since his return. If his faculties had become so impaired that he was too stupid for plain business when clear of drink, surely this must have been well known, and could have been easily proved. Yet all was rested on criticising the testimony of Mrs. Milnor and the judicial removal of the man from his *office of guardian* because he was intemperate. It is true that Mrs. Gardner might have called the witnesses of whom I speak; but I do not think her counsel was warranted in doubting that her case was fully made out, and must stand, till it was more seriously impeached, than it had yet been by opposing testimony. *Beck*, in his treatise on *medical jurisprudence*, vol. 1, 376, 1st ed. advises that "the conduct of drunkards should be particularly noticed during the intervals of temperance. If spiritous liquors exercise such an influence as to render us doubtful concerning the state of mind at this time, we may reasonably infer that the alienation is becoming permanent." Why was not such an obvious point of view resorted to? Was it enough to talk of the madhouse? This was evidently a mere misnomer. Doct. *Rush*, in treating of mental diseases, calls it a *sober-house*, and advises that an hospital be established in every city and town in the United States, for the exclusive reception of hard-drinkers. *Diseases of the Mind*, 267, *ed. of* 1812.

The ground taken by Rush is, that drunkards are mischievous. *Swinburne* says the drunkard is like a mad man during the time of his drunkenness; and cannot make a will when he is so excessively drunk that he is utterly deprived of the use of reason and understanding; otherwise, " if he be not clean spent, albeit his understanding be obscured and his memory troubled." 1 *Swinb.* 133, 4, *ed. of* 1803. *Black.* 2 *Com.* 497, says " he is incapable when his senses are besotted with drunkenness." Mr. *Stock*, in his late treatise on the law of *non compotes mentis*, 46, 7, gives us the result of the authorities, that " proof of drunkenness amounting to insanity will invalidate a will; but if it be shown that the testator was not under the influence of strong liquors at the time of the execution, the presumption will be in favor of the will, a presumption strengthened or impaired of course by the internal evidence of the contents." What reason, I ask, had Mrs. Gardner to suppose she did not stand within the very terms of the rule, after proving that her husband was perfectly sober when he destroyed the bond? Least of all, I think had she reason to expect the imputation of undue influence; and feel herself called upon to repel any thing of that kind. There was not one particle of evidence that she had ever urged her husband on the subject; and I must be permitted to deny, on authority, that her general influence could be received as any proof against her. In *Williams* v. *Goude*, 1 *Hag. Eccl. Rep.* 577, 581, 595, a like inference was sought to be made. There the husband was a tavern keeper; and, it seems, not only drank, but had become a good deal stupified under an attack of the apoplexy. In respect to the charge of undue influence, Sir John Nicholl remarks; " There was the general influence of an active, bustling, high spirited wife, over a good natured easy husband; in consequence of his attack, it was necessary she should take a still more decided lead in the management of the concerns of the house. It was necessary she should, as a kind nurse and an affectionate wife naturally would, insist on his going to bed at his regular hour; on his not indulging too freely in liquor," &c.; adverting to other acts of salutary influence. But he adds; " I can find

no trace of any unfair importunity, on the part of the wife
to induce him to alter his will, or do any testamentary act."
The general influence arising from his affection for and de-
ference to his wife, the learned judge refuses to admit as
matter of suspicion.   He says, in another place : "Indeed,
it would be extraordinary, if the influence of affection and
of warm attachment is to take away the power of benefitting
the object of that regard.   The influence, to vitiate an act,
must amount to force and coercion destroying free agen-
cy, it must not be the influence of affection and attach-
ment, it must not be the mere desire of gratifying the wish-
es of another ; for that would be a very strong ground in
support of a testamentary act.   Further, there must be
proof that the act was obtained by this coercion ; by im-
portunity that could not be resisted ; that it was done
merely for the sake of peace, so that the motive was tanta-
mount to force and fear." ·  Was there any thing of all this
in Mrs. Gardner's case which it lay with her to repel.   I
confess myself utterly at a loss to conjecture on what the
mind can fasten itself bearing the remotest semblance of
undue influence.   These probate investigations were an
every day matter with Sir John Nicholl, who fixes the *onus*
on the party charging undue influence, saying he must put
his finger on the act, showing how it was wrought.   In the
case at bar, the auditors say Gardner was *exposed* to undue
influence.   The surrogate adds he *may perhaps* have la-
boured under the terror of being sent back to the mad-
house ; and the chancellor says,  " I must presume the moth-
er, or some one else, had persuaded the decendent to destroy
the bond."   Certainly he was exposed to influence, and,
so is every man on a bed of sickness, or in the hands of his
nurse, even though she be his wife.   Are we, therefore, to
presume that it was exerted ?  *Perhaps* he was afraid of
being sent back—are we therefore to presume that Mrs.
Gardner shook his purpose by threats of incarceration ?   If
we proceed from exposure, into the regions of conjecture,
it is difficult to conceive how a great majority of testamen-
tary acts are to escape the imputation of undue influence.
If I could presume that Mrs. Gardner, or some one else,

persuaded her husband to forgive her the loan, it appears to me, with great deference, to be a perfect *non sequitur.* Was there fraud? Was there terror? Was there harrassing importunity, and a compliance for the sake of peace in the dying hour! *Stock Non Comp. Ment.*, 47, 8. Had Mrs. Gardner the least reason to suppose that her conduct was open to this harsh construction? Why did she not seize with unbecoming eagerness on the request that she herself would destroy the bond? A messenger is resorted to. The trustee gives up the bond. The testator is allowed time to pause and reflect. This is the proof. Is it not more natural to suppose that she had been slow and sorrowful, in yielding to the severe treatment of her unhappy husband? Is it possible I can be mistaken, when I suppose that no presumption ought to arise against her, because she had taken the helm from the hand of a drunken pilot; and thus saved the remnant of his fortune from shipwreck? What would otherwise have been left for him to bequeath in favor of the respondents or any body else? We are not dealing with a needy and artful adventurer insinuating herself into a marriage with age and weakness, for the sake of a fortune. Each had a competency; and we find the testator living at Mrs. Gardner's own house in Prince-street. They had doubtless contracted their union with the ordinary expectation of wealth and respectability and domestic happiness. Mrs. Gardner had lived to see all these hopes fade, without any fault of hers, and, moreover, found herself involved in the usual round of fallacious expedients to reclaim an intemperate husband. She must have been miserable; but her suffering for years does not appear to have subdued her affection, or led her to fault in the discharge of her duty. The husband seems to have become sensible of all this in his last sickness; and I have been unable to detect any other influence as leading to a destruction of the bond.

He had the undoubted legal power to forgive this debt to his wife. 2 *Kent's Comm.* 153, 3*d ed., and the cases there cited,* in the form which the deposition of Mrs. Milnor represents him as having pursued. *Richards* v. *Syms, 1 Bar-*

Gardner v. Gardner.

*nardist, Ch. R.* 90. And to my mind the proof is entirely clear, not only that the requisite form was complied with; but that it is free from the imputation of insanity or undue influence.

The whole, however, I think, resolves itself into a question of evidence; and I agree to the proposition of one of the counsel for the respondents in his argument, that if this court should believe there was a fair conflict of evidence before the auditors, and the law will not allow an issue, their conclusion ought not to be disturbed. I would give it the force which we allow to a verdict on a motion for a new trial, and refuse to reverse their report, except in a case where they may have concluded against the decided weight of evidence. Such I think is the case at bar. But even if there was a fair conflict of evidence, as I think there was power in chancery to award an issue, it should have been done. In either view I am for a reversal of the chancellor's decree. Should this court, however, differ with me upon the force of the evidence with regard to the destruction of the bond, then I am of opinion the decree of the chancellor should be affirmed.

The manner of introducing the charge of the two thousand dollars before the auditor, was a mere matter of practice; and the costs, though final, are not in this case the subject of appeal. Both rested in the discretion of the court below. *Rogers* v. *Holly,* 18 *Wendell,* 350, *and the cases there cited. Rowley* v. *Van Benthuysen,* 16 *Wendell,* 369.

On the question being put, *Shall this decree be reversed?* *twenty* members of the court answered in the *affirmative,* and *three* in the *negative.* Whereupon so much of the decree of the chancellor as affirmed the decree of the surrogate, charging the appellant with the sum of $2000 loaned to her by her husband, was REVERSED.