## G. BRINCKERHOFF *v.* LAWRENCE, Administrator &c., and J. L. BRINCKERHOFF.

G. asserted claims against two brothers who were partners, as well in their own right, as executors of his father's estate, and a legal controversy was likely to ensue. D., his mother, who was the assignee of two bonds given by G. to the two brothers, two years before her death attached to the bonds a writing signed by her, expressing her desire to prevent such a controversy after her death, and directing the bonds to be cancelled on G.'s executing a discharge of all demands to his father's executors and to each of his brothers and sisters; and if he should refuse, then the bonds were to be made a set-off against any such demands, but they were never to be put in suit against him. The bonds and writing were in D.'s possession at her death, and there was no evidence of their having ever been out of her possession, or of any formal delivery of the writing by her.

*Held*, in a suit against her administrator, that the bond should be delivered up to G. on his executing the discharges specified in the writing signed by D.

Also that the instrument could not be sustained as a *donatio mortis causa*, nor on the ground of an appointment, or as a direction to her legal representatives; but that it was rather the discharge or forgiveness of a debt.

It seems there is a distinction between donations unaccompanied by delivery, where the object is to forgive a debt; and those in which the donor's apparent intent is to transfer property, either in his possession or by means of his own note or bond.

An averment of the *execution* of a deed or writing, imports *delivery*, as well as signing.

The strong expressions in the books of the common law, against sustaining dona-

tions, either *mortis causa* or *inter vivos*, without tradition or actual delivery, are owing to such gifts being usually claimed on parol evidence.

Where the intent of the donor is proved under his own hand, a delivery will be presumed from slight circumstances.

The retention of the deed or instrument by the donor, does not impair its validity, unless there be clear and decisive proof that he never parted or intended to part with its possession.

Though courts of justice ought never to strain a point of law to relieve a case of hardship, or to support a claim however meritorious; equity should strive to validate an instrument, evidently designed to be made effectual by the party, which proceeded not merely on a good consideration, but on that of settling and avoiding family broils; if the principles of law, or the force of judicial decisions will sanction a decree in its support.

January 17; March 7, 1845.

THE bill in this cause was filed October 5th, 1842, by George Brinckerhoff against John L. Lawrence, administrator of Dorothea Brinckerhoff, and James L. Brinckerhoff as survivor of himself and Abraham Brinckerhoff, Jr. Mrs. B. was the mother of George, Abraham and James. The object of the suit was to have delivered up and cancelled, two bonds executed by George B. to Abraham and James; one for $3258 27, dated March 3, 1823, and the other for $1900 dated May 10, 1823; both of which were payable on demand, with interest half-yearly.

It appeared that in 1823, and for several years before, Abraham and James were partners in trade in the city of New York, under the name of Abraham Brinckerhoff, Jr. & Co., and that the complainant had many dealings and transactions with the firm, and for several years was their attorney, solicitor and counsel.

The father of these parties, Abraham Brinckerhoff, died in March, 1823, seised and possessed of a large estate, and leaving a last will and testament, by which, amongst other things, he gave to his wife Dorothea, an annuity of $5000 during her life, and made her executrix, and his sons Abraham and James together with John S. Schemerhorn, his executors.

On the 28th of October, 1823, Abraham and James B., transferred and delivered to their mother as a payment by them as executors towards her annuity, George B.'s bond of $1900; and on the 31st of December, 1825, they transferred and delivered to her in like manner and on the same account, his bond of $3258 27.

Soon after the death of their father, difficulties and controversies arose between the complainant and his brothers, which were never adjusted or reconciled.

The complainant made large claims against them for profes. sional services, and the proofs in the suit established the validity of such claims. There had been a settlement between him and his brothers firm in 1821. Many of the services however were rendered after that time. There were counter charges on the other side, but the precise state of the matter, either aside from the bonds or including them, was not shown. George B. alleged in his bill, that his just demands against his brothers individually and as executor of his father, were fully equal to all their claims against him, including the bonds. He was ignorant of the transfer of the bonds to his mother, until some years after her death, and no demand of payment, or assertion of claim upon them, was made from the time they were given, until August, 1842, when her administrator commenced a suit on them in the Supreme Court, in the name of James L. B., as survivor of himself and Abraham Brinckerhoff, Jr., who died in 1828.

Mrs. B.'s administrator, who was appointed in 1842, received the bonds from the hands of James L. B., as a part of his mother's assets with a writing attached to them, signed by her, in the words and figures following,

"Whereas I am desirous of preventing any legal controversy after my death, between the members of my family, if in my power. And whereas, I hold the annexed bonds and evidences of debt against my son George Brinckerhoff; I hereby direct the said bonds and evidences of debt, to be cancelled upon his or his legal representatives executing a good and sufficient discharge to the executors of my husband's estate, and also good and sufficient discharges to each of his brothers and sisters, or their heirs, of all demands whatever against them. And in case he should refuse so to do, I direct these bonds and evidences of debt to be made a set-off against any such demands, but they are never to be put in suit against him.

"New York, Jan. 21st, 1832.        *Dorothea Brinckerhoff*."

Mrs. B. died on the 26th of July, 1834. She left a will, which was subsequently set aside, after several years contestation, for

the want of a proper execution and publication ; (see *Brincker-hoff* v. *Remsen*, 8 Paige, 491, and 26 Wendell, 325 ;) and Mr. Lawrence became her administrator.' After the suit on the bonds was commenced, the complainant offered to the administrator to execute and deliver such discharges as were expressed in Mrs. B.'s writing annexed to the bonds, and to pay the costs incurred, on the bonds being cancelled. This offer was declined by the administrator, under the advice of his counsel.

The cause came to a hearing on the pleadings and proofs.

*G. Brinckerhoff*, in person, and *G. Wood*, for the complainant.

*J. S. Lawrence* and *D. B. Ogden*, for J. L. Lawrence, administrator, &c.

*M. S. Bidwell*, for J. L. Brinckerhoff.

THE ASSISTANT VICE-CHANCELLOR.—The objection that the defence to these bonds is a legal question, and the complainant's remedy is adequate at law, is presented for the first time, at the hearing, and therefore comes too late.

It is also objected that the whole case as now exhibited, upon the instrument signed by Mrs. Brinckerhoff, has been decided by the Supreme Court, in favor of her administrator.

If this be so, I ought not to examine the case ; and my first inquiry will be into that subject. The obligor in his defence to the two bonds in the Supreme Court, set forth in a plea, the transfer of the bonds to Mrs. B., that he had claims and demands as well against the executors of his father, (of whom she was one,) as against the representatives of the deceased obligee, and J. L. Brinckerhoff, the surviving obligee ; and that thereupon Mrs. B. from the motives and for the consideration and reasons which are therein expressed, *made and executed* the instrument in question. That after her death, the obligor tendered the releases which are called for by that instrument, and required a delivery of the bond from her administrator, who declined to deliver it up. And that thus Mrs. B. by that instrument, appropriated and applied those claims and demands of the obligor, in

and to the liquidation and payment of the bonds, upon such releases being made; and by reason of the premises the bonds were fully paid, satisfied and discharged.

To this plea there was a demurrer, and the court gave judgment against the plea. The plea was certainly anomalous. It was a special *solvit post diem*, in which the pleader instead of setting forth the simple fact of payment, and relying upon this special matter as evidence to support it, has pleaded the evidence itself, and averred that the matter constituted payment. The evidence thus pleaded does not show an actual payment, whatever a jury might reasonably infer from it, if presented to them as proof of payment.

The opinion of the Chief Justice on the demurrer, is very brief and notices but two points. He says that it is a radical defect in the plea that no delivery of the instrument signed by Mrs. B. is averred. In this I most respectfully suggest, the learned judge erred. The averment in the plea is that she *executed* it, which imports delivery as well as signing. (See *Cecil* v. *Butcher*, 2 J. & W. 571.)

The other point adverted to, is that the instrument is not valid as a *donatio mortis causa*. Of this there can be no doubt, and it is not claimed to operate in that mode.

The question presented by this bill was therefore not before the Supreme Court, and I do not understand their decision as bearing upon it in any manner.

The complainant in the first instance, relies upon the instrument as a valid equitable *appointment*, in the nature of a donation *mortis causa*, and founded upon the same principle.

In support of this position, he cited *Lawson* v. *Lawson*, (1 P. Will. 441,) where the Master of the Rolls held a gift of a bill for £100 drawn by the testator in his last sickness upon his goldsmith, in favor of his wife, to be good and to operate as an appointment, and that it amounted to a direction to his executors to appropriate the £100 to his wife's use. It appears that the bill was indorsed by the testator himself to be for mourning, and it might well be upheld as a testamentary disposition. Lord Loughborough thought that was the *ratio decidendi* of the case of Lawson, as appears by his observations upon it in *Tate* v.

*Hilbert*, (2 Ves. jr. 120, 121.) On any other ground, it is opposed to the decision in the case last cited, and to subsequent decisions.

The other case relied upon under this head, ( *Wekett* v. *Raby*,) I will notice elsewhere.

Swinburne says, there are three kinds of legacies of the nature of *donatio mortis causa*, two of which are clearly gifts *inter vivos* at common law. (Swinb. on Wills, 57, cited in 1 Roper on Leg. 1. (25.) ) One of these is sometimes cited to sustain a gift without delivery, viz : Where a person not terrified by the apprehension of any present peril, but moved by the general consideration of man's mortality, makes a gift. It will be perceived that this after all, leaves it to be settled, what will make a gift valid. In the civil law, some gifts were valid without delivery, but not so in the common law. Swinburne was a doctor of the civil law, and his treatise is principally compiled from that source and the canon law. Lord Loughborough shows in *Tate* v. *Hilbert* before cited, (2 Ves. jr. 118, 119,) that Swinburne was not accurate in his definitions on this class of gifts ; and Lord Hardwicke in his masterly judgment in *Ward* v. *Turner*, (2 Ves. sen. 438 to 442,) says that by the civil law as received and allowed in England, and so by the law of England, tradition or delivery is essential to all gifts made in contemplation of death, whether immediately or remotely expected.

I do not see that the instrument can be sustained on the ground of appointment or direction to Mrs. B.'s representatives.

In the next place, can the court enforce it as an instrument which was once delivered, and then retained by Mrs. B. in her own possession ?

The argument on the part of the defendant, conceded that if the writing had been delivered, it would have been operative to discharge the bonds on the condition being performed. And on such delivery it would have been valid in her lifetime.

The only word in it which is indicative of a future operation is " *direct* ;" and that word is not addressed to the representatives of Mrs. B. It is true the instrument recites that she is desirous of preventing any legal controversy after her death between the members of her family, if in her power; but the means which

she therein designed to use, and all the objects which the instrument shows that she had in view, were capable of immediate accomplishment.

Therefore if it were in fact delivered, it may be upheld as a valid present gift or forgiveness of the debt, *inter vivos.* Indeed, if it were to be future in its operation, several of the cases to which I will presently refer, show that it would nevertheless be valid if it were delivered.

Then I meet the strong position, that there is no evidence of its ever being delivered by Mrs. Brinckerhoff.

There certainly is no direct testimony that the paper was ever formally delivered to any person, or that it ever was out of her hands. But courts often infer a delivery, and leave it to juries to presume one, from circumstances, when the instrument comes from the possession of the party by whom it was signed, and where there is no evidence whatever of his having parted with its custody when it was signed or subsequently.

There are many strong expressions in the books of the common law, against sustaining donations, either *mortis causa* or *inter vivos,* without actual delivery. The reason of this is, that gifts of both classes are usually claimed upon parol evidence, unsustained by any writing; and the courts have uniformly set their faces against such claims, on account of the great danger of perjury.

Where the intent of the donor is proved under his own hand, there is no such danger; and the courts have accordingly presumed a delivery in support of the gift, on slight evidence.

In the first place, the principle is the same as that laid down by Chancellor Kent, when speaking of a voluntary settlement, upon a daughter, which was found in the possession of the grantor; "It is always binding in equity upon the grantor, unless there be clear and decisive proof, that he never parted, nor intended to part, with the possession of the deed ; and even if he retains it, the weight of authority is decidedly in favor of its validity, unless there be other circumstances, besides the mere fact of his retaining it, to show that it was not intended to be absolute." (*Souverbye* v. *Arden,* 1 J. C. R. 256.)

A reference to some of the authorities will show the application of the principle.

In *Barlow and wife* v. *Heneage*, Prec. in Ch. 210, the father signed a voluntary settlement and also a bond, to trustees, in favor of his two daughters, but kept both deed and bond, and received the rents of the estate included in the settlement, until his death. It was objected that the deed and bond were both voluntary, and always kept by the father in his own hands; but the Lord Keeper held that they were valid.

In *Clavering* v. *Clavering*, 2 Vern. 473, a voluntary settlement, made in 1684, never delivered out, or published by the grantor, but kept by him and found among his papers after his death, was held to prevail over a subsequent settlement made in 1690, and over the will of the grantor. And the decree was affirmed in the House of Lords. (7 Bro. P. C. 410, Tomlin's ed.)

Lady Hudson's Case, referred to by Lord Keeper Wright, in 2 Vern. 476, is similar, and the instrument was held valid.

In *Johnson* v. *Smith*, 1 Ves. sen. 314, a father made a deed of gift to his natural daughter, of all his mortgages, securities and debts due to him. He never delivered the deed, and he continued to treat the securities as his own; collecting, changing them, &c. This was held valid, upon the relationship and considerations for it existing between the parties; but the daughter was required to elect between that and a subsequent voluntary provision made by the donor.

In *Antrobus* v. *Smith*, 12 Ves. 39, which is sometimes cited on the other side, the court laid stress upon the declared intention of the donor to substitute a marriage portion for the gift which was in question. So that there was not only no delivery, and no intention to part with the control, but there was positive evidence of a contrary intent. And in that case the instrument itself was incomplete without some further act of the donor in transferring the stock embraced in the gift.

In *Uniacke* v. *Giles*, 2 Molloy, 257, where the deed of gift was executed, but always remained in the donor's possession and was destroyed by her; the court at first, sent it to a jury to try the question whether the deed was duly executed. The jury found that it was duly executed. It was however to take effect on the donor's death, and was of a chose in action. Upon this and her

keeping it in her custody, it was held that it was intended to be revocable and that she had revoked it.

In *Exton* v. *Scott*, 6 Simons, 31, A. who had privately received and used moneys of B., secretly and without any communication with B., prepared and executed a mortgage to B. for the amount. The execution was in A.'s private office, when no one was present but his clerk, who attested the execution, and A. kept it secret during his life, and died insolvent twelve years after its execution; the mortgage never having been out of his possession. The court held that there being no evidence that it was executed conditionally, it took effect from its execution and was good against A.'s creditors.

In *Fletcher* v. *Fletcher*, 8 Lond. Jur. Rep. 1040, before Vice-Chancellor Wigram,(a) the court sustained as a debt, a voluntary covenant, which the testator had made in favor of natural children. He had made a formal execution of it before his solicitor, but took and kept the deed till his death, and its existence was not known either to the trustees named in it, or the parties interested, until after his death.

(See also *Sear* v. *Ashwell*, 3 Swanst. 411, n. and *Worrall* v. *Jacob*, 3 Mer. 256, 270.)

The conclusion of Sir Thomas Plumer, Master of the Rolls, in *Cecil* v. *Butcher*, 2 J. & W. 578, shows the limitations under which equity proceeds in rejecting these gifts. Cases not within those limitations would of course be maintained according to his judgment. After stating the difficulty of extracting a principle from the authorities, he says there is a great preponderance of authority in support of the proposition, that "in a case where a voluntary deed is made without the knowledge of the grantee when it is made, for a special purpose for which it was never required to be made use of, when it has been kept in the hands of the grantor without ever being acted on, a court of equity will not relieve upon it."

The case of *Grangiac* v. *Arden*, 10 Johns. 292, is a strong authority on the question. The father purchased a ticket in a

(a) Now reported also in 4 Hare, 67.

lottery, on which he wrote the name of his daughter, then a child, and he declared it was bought for her. The ticket drew a large prize, which the father received, and used in his trade. He often said the prize was his daughter's and the money was hers with the profit upon its use; but neither the ticket, or its proceeds were ever in her possession. The Supreme Court held that the jury might from these facts infer a delivery of the gift, and on a case subject to the opinion of the court, gave judgment in accordance with that inference. (See also, *Davis* v. *Davis*, 1 Nott & McCord's R. 225, note, b.)

It will be perceived that a delivery is inferrible from slight circumstances; and where an actual delivery is shown, it may be of the merest formal character. A simple signature, and handing the instrument to the solicitor who prepared it, or giving it to a clerk to attest it, and then taking it back and always keeping it, is held conclusive, without any attendant circumstance whatever.

So it is not necessary that the gift shall take effect immediately, but if there be a delivery, the gift is valid although contingent, or not intended to take effect till after the death of the donor. (*Peck* v. *Parrot*, 1 Ves. sen. 236; *Johnson* v. *Smith*, before cited and S. C. Belt's Supplement to Ves. sen. 154; *Powel* v. *Cleaver*, 2 Bro. Ch. Ca. 499, 502.)

In this instance, there are many circumstances in support of the presumption of a delivery of the instrument in such a form as to make it valid; not to the complainant, but to the person who prepared it; or a similar formal delivery.

It was not a testamentary disposition, nor was there any apparent intention to preserve by means of the bonds, any further control over the complainant. Its whole consideration and inducements were then in existence, and were founded on events already passed. The instrument shows that Mrs. B. knew her son George had, or claimed to have, demands against her late husband's executors, and against her other sons. It shows, either that there was already difficulty between George and his brothers, or that the embers of a controversy were already glowing and likely to burst into a flame. Her design was to extinguish those embers, by having George release all his claims; and

to induce such a release, by forgiving to him the bonds in question. This did not look to the future. The case before me shows that she could scarcely have imagined that any future dealings or claims were to grow up between him and her other children, and the improbability that the condition in the instrument was to operate upon any such claims. She had placed in that condition, all the power and control that she intended to have over the bond debt. When the condition was complied with, her intent would be fully accomplished. She declared emphatically, that the bonds were never to be put in suit against this complainant.

There is no reason to doubt upon the facts disclosed, but that Mrs. B.'s intention was, to make an absolute and final disposition of these bonds; and that she had no intention to do any further act on her part, or to attach any other qualification or condition to their discharge, than that expressed in the instrument which she signed. These circumstances are very strong to prove a formal execution or delivery; as may be seen by the Lord Keeper's observations in *Ward* v. *Lant,* Prec. in Ch. 183, and those of the Master of the Rolls in *Hooper* v. *Goodwin,* 1 Swanst. 491. In one of these cases, there was shown to be an intention that the writing should not take effect, and in the other there was a further act to be done by the donor, which he was preparing to do, but never effected.

The authorities upon the subject of gifts *inter vivos,* are certainly somewhat inconsistent, and the principle of some of the cases difficult to appreciate.

But having regard to the preponderance of authority, and the force of the circumstances attending this instrument, I should feel bound to direct an issue upon the question of its delivery, if the case turned wholly upon that point.

In the case of *Pye, Ex parte* and *Dubost, Ex parte,* 18 Ves. 140, 150, the testator had written to his agent at Paris to buy an annuity of £100 for a person who had been his mistress, and to draw on him for the purchase money. The agent bought the annuity accordingly, but took it out in the name of the testator, because the lady was deranged. The testator soon after sent to the agent, a power of attorney to transfer the annuity to her, but died

before the agent made the transfer. Thus there was a full intention to make an absolute gift, and the testator had signed all requisite papers, but there was no delivery of the subject matter of the gift. Lord Eldon sustained it however, on the ground that the testator had committed to writing a sufficient declaration that he held that part of his personal estate, (the annuity,) in trust for the annuitant.

The case under consideration is analogous, if there were any execution of the writing by Mrs. Brinckerhoff. This doctrine of a trust has been applied in other instances where there was no delivery of the things bestowed, or the covenants being voluntary, could not be enforced. But I find no authority for it, where the writing on which it rests, has not had a formal execution, so that it does not aid this case independent of the question of the delivery of the instrument.

Courts of justice ought never to strain a point of law to relieve a case of hardship or to support a claim however meritorious; yet I think that a court of equity should strive to uphold and validate an instrument, which the party evidently designed to make effectual, and which was made not merely upon the good consideration of the complainant's demands against members of her family, but on the high and holy consideration of settling existing family broils and avoiding them in future; if the principles of law, or the force of judicial decisions, will sanction the decree.

There are several decisions some of which are authoritative, and others entitled to entire respect, which it appears to me, fully sustain the complainant's case upon the instrument in question.

Without relying upon the presumption of its delivery or formal execution, I will proceed to a statement of those decisions.

In the case of *Wekett* v. *Raby*, 2 Bro. P. C. 386, (Tomlin's ed.) there had been great intimacy between Mr. Pigot, the testator, and Raby who was his counsel. Pigot had given Raby large sums, and Raby had released him from all demands. Besides this, Raby owed Pigot a bond for £235 5s. In his last sickness and a few days before his death, the testator made this declaration touching the bond. "I have Raby's bond, which I keep; I don't deliver it up, for I may live to want it more than he; but when

I die, he shall have it, he shall not be asked or troubled for it." The bond being put in suit after his death, by his executrix and residuary legatee, Raby filed a bill to have it delivered up, and Lord Macclesfield decreed it to be delivered up to be cancelled. It was proved that the executrix soon after the testator's death virtually promised to give up the bond to Raby; but the bill proceeded entirely upon the testator's order and direction in his last sickness. On an appeal to the House of Lords, this decree was affirmed February 23, 1724.

This case has been the subject of much remark. Sir John Mitford, then Attorney General, and Mr. Leach, afterwards Vice-Chancellor, in *Byrn* v. *Godfrey*, 4 Ves. 9, put it upon the ground that it would have been a fraud in the residuary legatee to disappoint the intention of the testator. They, as well as Lord Loughborough in the same case, speak of the legatee's promise to deliver up the bond; but it will be observed that the answer did not admit the promise, and there was no proof to that effect, except in answer to a naked solicitation of Raby to her, to give it up out of friendship, without making any reference to the testator's gift, or claiming any right to have it cancelled.

*Aston* v. *Pye*, 5 Ves. 351, note b., and page 354, as stated by the Chancellor, was a suit in the Common Pleas on a note of Pye to the testator who was his uncle. After the testator's death an entry was found in his book in these words, "Pye pays no interest, nor shall I ever take the principal unless greatly distressed." The court held this to be a discharge of the note.

In *Eden* v. *Smyth*, 5 Ves. 341, 356, there was an attempt to defeat a legacy given to Eden by his father-in-law, Smyth, in his will; by means of a bond for £1000, which Eden had given to Smyth for borrowed money, and two other bonds, one for £1000 and one for £900 which Smyth had signed with Eden to others as surety for money loaned; the latter of which Smyth had paid in his lifetime, but had not taken an assignment of it. This bond and the bond given directly to Smyth, were in his possession at the time of his death. A letter from Smyth to Eden's mother, was produced, in which S. says, he has released Eden and his wife of £1000 he had lent to Eden, and that the principal of the £1000 to Boucher (for which Smyth signed as surety) must fall

to his (Smyth's) lot. By the testator's annual statements of his property, and from two or three loose memoranda, it appeared, that for a time he entered the £1000 bond executed directly to him, as a debt due from 'Eden; and the other £1000 and the £900 bond, as debts owing by himself which Eden was to pay; but subsequent to the testator's receiving a large accession to his property from a relative, he no longer entered Eden's bond as due to him, or the £900 bond as payable by Eden; and entered the Boucher bond as one that he was to pay himself.

On this testimony Lord Loughborough held that Eden was discharged from the debts. He declared that he was satisfied from all the papers together, that it was no intention of Smyth that these debts should have been put in demand by his executors; that the paying off the bond of £900 without taking an assignment of it, with the other facts, made it perfectly evident that he had no intention to make any demand for the £900; and that the letter to Mrs. Eden would as to the first £1000 bond, be evidence of a release at law, and would destroy the bond.

It will be observed that there was no delivery of the gift, or of any writing by which the intention to make the gift was manifested; in either of the cases last cited. And the securities discharged by the gift remained in the possession of the donor until after his death.

In *Welcett* v. *Raby*, there was not even written evidence of the intention; and in neither of the cases, was the intention to forgive the debt, so plainly and unequivocally proved, as it is in the case now under consideration.

In *Gardner* v. *Gardner*, 22 Wend. 526, a parol gift by a testator to his wife, was sustained by the Court for the Correction of Errors, (reversing the Chancellor's decision upon the facts involved,) under these circumstances. The testator had loaned to his wife $2000 in 1827 and taken her bond for its re-payment. The wife had a separate estate and the money was borrowed for the benefit of that estate; so that by the law as settled in this state, her separate property was answerable for the debt. The debt was collectable in equity, and the bond would furnish a part of the evidence of the debt; but the bond was not recoverable at law, and equity would require accompanying proof of the

purpose for which the loan was made. In 1829, four or five months before his death, the testator who had previously delivered the bond to a friend with instructions to destroy it, if any thing happened to him; sent for the bond, and burnt it up himself, telling his wife that the money was hers. It was also proved that before sending for the bond, he had on the same day requested his wife to destroy the papers, if any thing should happen to him, which she declined to do.

The reporter has stated this case as a *donatio mortis causa,* but the decision does not rest upon or even approach that ground.

In *Tower* v. *Taggart, administrator of Tower,* 5 Binney, 490, the intestate had paid into Taggart's hands large sums of money from time to time, till they amounted to $10,000. He was under personal obligations to Taggart in early life, and repeatedly said that Taggart's family should lose nothing by it, and that he should leave $8000 to Taggart's children. After his death a paper was found in his pocket book, signed by him and acknowledging that he was indebted to Taggart in the sum of $8000 for value received of him, and dated subsequent to the deposit of the whole $10,000. The court held that under the circumstances of the case, the writing should be considered as evidence of a debt due by the intestate to Taggart, which the latter might retain out of the $10,000.

In *Wentz* v. *Dehaven,* 1 S. & R. 312, the testator having a bond and mortgage against his daughter and her husband Wentz, signed a writing in the presence of two witnesses, in which he stated that he had a bond and mortgage from Wentz, and concluded thus, " which I intend to give up to them, as I never intend to demand it from them, nor any part of the interest due or to become due at any time." He delivered this writing to Wentz, but he kept the bond and mortgage, and died ten years afterwards, without having ever received or called for any part of the principal or interest. The court held that the paper was an absolute and immediate discharge of the debt.

These authorities support the claim made to have these bonds delivered up, on complying with the prescribed condition.

It is not necessary, or perhaps possible, to make these cases to harmonize with some of those where the gifts were not sustained.

I will, however, suggest a distinction. The cases adverse to the validity of the donation, were those in which the donor has sought to transfer, or shown an intent to transfer, property actually existing and tangible, or to effect a gift by his own promise or contract to pay at a future time, as by making his own note, bond or the like.

In the cases which I have last cited and commented upon, the aim was *to forgive a debt*, to discharge an obligation already due from the object of the donor's bounty. A debt may be forgiven and discharged in effect by parol, as by means of a confession of payment; and it is never required that it shall be evidenced by so formal and authentic an act or instrument, as a donation of property, or the transfer of a thing in action.

Even a bond may be released by a parol agreement executed. (*Dearborn* v. *Cross*, 7 Cowen, 48.)

Whatever may be the true *rationale* of these decisions, I am content to be governed by them in this case, and must hold that the bonds are to be given up.

The suit at law being in James L. Brinckerhoff's name, he was a proper party to this suit.

There must be a decree accordingly, without costs to either party.