# SUPREME COURT.

## Eliza Davis agt. Bachus Culver and Joshua Culver.

Mere feebleness of intellect, or mental weakness and infirmity from age, dis-
ease, or any other cause, will not make out that *incapacity* which deprives
an individual of the power of disposing of his property by deed or will.   The
grantor or testator must be of *unsound mind*, which means, a *want of un-
derstanding*—a *total deprivation of reason.*

When the grantor or testator has understanding and intelligence, although it
may be of a low order—when he is capable of discriminating between right
and wrong—when he knows what he is doing, with whom he is acting, and
then realizes the nature and consequence of his acts, he is not of unsound
mind, and the law will not avoid his will, or deed, on that account.

The *influence* which the law not only refuses to recognize but repudiates, is *un
due influence*, denominated *undue*, because it is unrighteous, illegal, and de-
signed to perpetrate a wrong.   The undue influence exerted to procure the
execution of a deed, or a bequest, or devise by will, must amount to *fraud* or
*coercion.*   The grantor or testator must be overreached and deceived by some
false representation or stratagem, or by coercion physical or moral.

In this case, *held*, 1st. That Joshua Culver was entirely competent to execute
the deed of conveyance under which the defendant Bachus Culver claimed
title.

2d. That the execution of the deed was not obtained by undue influence.

3d. That, in respect to the lands claimed by the plaintiff, the defendant Bachus Culver was a purchaser in good faith, and for a valuable consideration; and,

4th. That the verdict of the jury was not supported by the evidence, and should be set aside    New trial granted—costs to abide the event.

*Second District, Brooklyn General Term, Oct., 1855.*

*Present,* S. B. STRONG, BROWN and ROCKWELL, *Justices.*

THIS was an action brought for the recovery of an undivided fourth part of a farm in Amenia, Dutchess county, containing about two hundred and sixty-two acres, worth about sixty dollars per acre; and was tried before DEAN, Justice, at the Dutchess circuit on the 13th Dec., 1854.

These were lands of which Joshua Culver, the father of the defendant Bachus C., died seized on the 12th day of June, 1848, leaving the said Bachus and the plaintiff, and Almyra Hoffman and Roxana Hoag, wife of Ezra B. Hoag, his only children, and heirs at law.

The defendant Bachus Culver claimed to be the owner of these lands in virtue of a deed executed to him by his father, Joshua Culver, dated 13th May, 1848, acknowledged the same day, and recorded in the clerk's office of Dutchess county on the 9th May, 1854.

Joshua Culver could not read nor write, except signing his name. For many years before his death he had been largely and actively engaged in the droving business; and Bachus, his son, now about fifty years of age, had devoted his time in assisting his father in the droving and farming business. Bachus signed notes with his father, and gave his own notes and checks for cattle purchased for his father. Bachus lived about one hundred rods from his father, on his father's farm: he had no land but what he got from his father.

Joshua Culver lost his wife in December, 1845, which greatly affected him. He complained to his physician that he had not been very well since his wife died: had been low spirited, and been failing in his health. He was at times dejected and melancholy. For a year or two before his death he was afflicted with the dropsy and a heart affection, of which disease he died,

at about the age of seventy-two years. He was taken down with his last sickness about two weeks after he had given the deed above mentioned to Bachus. He was visited frequently by his physicians, till just before he died, who testified that, in all their visits, they discovered nothing to the contrary of his being conscious and intelligent. They had no doubt of his perfect sanity. He was fearfully apprehensive of death when alone, and required watchers and attendants with him for some two or three weeks before his death. He was feeble in body, consequent upon his advancing years and the diseases under which he was laboring; but no imbecility of mind was discovered by his physicians, though Bachus had been proved to say, the old man was a "mere child," and had become "troublesome and childish."

At the time of the execution of the deed above mentioned to Bachus Culver, Joshua went alone to the office of Wm. Eno, Esq., with his title deeds, for the purpose of having that deed drawn. He also gave directions to Mr. Eno to draw an agreement between him and Bachus Culver, and the agreement was drawn according to the directions given. A few days after, on the 19th May, 1848, Joshua and Bachus Culver together went to Mr. Eno's office, when the deed aforesaid was delivered by Joshua to Bachus; and the agreement, drawn as before mentioned, was executed by them both, and is as follows:—

"Whereas, on the 15th day of May, 1848, Joshua Culver made, executed and delivered to Bachus Culver, a deed of a farm of land, situate in the town of Amenia, county of Dutchess, containing two hundred and sixty-two acres, for the sum of ten thousand four hundred and eighty dollars, said Bachus Culver assuming the payment of a mortgage, being a lien on said premises of five thousand dollars.

"Now, therefore, it is agreed by and between said Bachus Culver and Joshua Culver, that the said sum of $10,480 shall be paid in manner following, to wit: It is understood, that whatever debts and demands due from said Joshua Culver and Bachus Culver, either by note or otherwise, or debts and demands

due from either said Joshua Culver or Bachus Culver, whether by note or otherwise, is considered as the debts of said Joshua Culver, and whatever sum said Bachus Culver shall pay towards or in satisfaction of said debts, shall be so much paid towards the consideration of said farm. And the said Bachus Culver agrees to pay the said debts in consideration of the said conveyance, to the amount of the said sum of $10,480, in case that there is that amount of said debts existing, and to pay the balance, in case there is not that full amount, to said Joshua Culver. In witness whereof we have hereunto set our hands and seals this 19th day of May, 1848.

" Joshua Culver,
" Bachus Culver.

" In presence of
    " Wm. Eno."

Other facts, material to the case, will be found in the opinion.

The jury found a verdict for the plaintiff: whereupon the defendants moved for a new trial on a case. The cause was argued by

Henry Hogeboom, *for defendants.*
John Thompson, *for plaintiffs,*

Cited *Huguenin* agt. *Bazeley,* 14 *Vez.* 273; *Cooke* agt. *Lamotte,* 11 *Eng. Law & Eq.* 26; *Hoghton* agt. *Hoghton, id.* 134, 138; *Whelan* agt. *Whelan,* 3 *Cowen,* 537; *Brice* agt. *Brice,* 5 *Bar. S. C. Rep.* 533; *Gale* agt. *Wells,* 12 *Bar. S. C. R.* 84; *Sears* agt. *Shafer,* 2 *Selden,* 272; *Mowry* agt. *Sibley,* 2 *Brad. Sur. Rep.* 133; 2 *Gr. Ev.* § 688. *and note* 1.

By the court—Brown, Justice. The plaintiff is one of the heirs at law of Joshua Culver, deceased, and this action is brought to recover one fourth part of a farm in the town of Amenia, Dutchess county, of which, it is alleged, Joshua Culver, the ancestor, died seized.

The defendant Bachus Culver is the son of Joshua Culver,

deceased, and claims title to the lands under a deed of convey-
ance from his father, bearing date May 13, 1848. Joshua, the
father, died on the 12th June, 1848. The deed is executed in
due form, and conveys the premises in dispute; the considera-
tion expressed in the deed being $10,480; and the premises at
the time were subject to a mortgage of $5,000.

The real question involved is upon the avoidance of the deed.
The burden is thrown upon the plaintiff. To avoid the deed,
she must then show, 1st. The' incapacity of the grantor, at the
time it was executed; or, 2d. That it was obtained by undue
influence.

Mere feebleness of intellect, or mental weakness and infirm-
ity from age, disease, or any other cause, will not make out
that incapacity, which deprives an individual of the power of
disposing of his property by deed or will. The grantor must
be of unsound mind, which means, a want of understanding.
" Weak minds differ from strong ones only in the extent and
power of their faculties; but unless they betray a total want of
understanding, or idiocy, or delusion, they cannot properly be
called unsound."

Again: being *non-compos*, of unsound mind, are certain well
defined terms in the law, and import a total deprivation of
reason. Now, weakness does not carry this idea along with
it; but courts of law understand what is meant by *non-compos*,
or insane, as they are words of a determinate signification.
(3 *Denio*, 42.) The books are filled with cases of this descrip-
tion, and they all result in this conclusion, that when the grantor
or the testator has understanding and intelligence, although it
may be of a low order—when he is capable of discriminating
between right and wrong—when he knows what he is doing,
with whom he is acting, and then realizes the nature and con-
sequences of his own acts, he is not a person of unsound mind,
and the law will not avoid his will, or deed, on that account.

It is not my design to examine the testimony at length. It
is quite voluminous, and it fails entirely to show want of ca-
pacity. The testator knew quite well what he was about. He
may have been eccentric—at times exhibited an irritability or

Davis agt. Culver and Culver.

loss of temper, and his memory may have occasionally been at a loss. All these are common to persons in advanced life. He was at the age of seventy-two when he died; and it would have been remarkable if the infirmities attendant upon fullness of years had not made their appearance now and then.

Up to the time he executed the deed, he seems generally to have been intelligent, and to transact business much as usual. He borrowed money, advised others in respect to their affairs, and at the very time he executed the deed to Bachus Culver, he also executed a deed of the house and lot in Pine Plains to the husband of the plaintiff, and no one made objection thereto or claimed that his mind was unsound. The manner in which the deed was prepared and executed, the consideration money, and the provisions in the article of agreement which accompanied the deed, for the payment of the debts of the grantor, some of which stood in his own name, and some of them in the name of his son, the amount of the purchase money, all plainly indicate an intimate knowledge of his own business, and an intelligent understanding of the transaction in which he was engaged. It would be absurd and ridiculous, in my opinion, to say, that there was anything like want of understanding, or mental incapacity, on the part of the grantor, at the time the deed was executed, and the sale consummated, to Bachus Culver.

The learned counsel for the plaintiff does not, I understand, insist seriously that the incapacity is made out. Indeed, I regard the pretence as completely and effectually disproved by the evidence.

Let us now turn our attention to the question of undue influence, and see whether anything of that kind operated upon the mind of the testator.

First, let us ascertain, if we can, what undue influence is. Men who live in habits of intimacy and friendship, influence one another more or less. Fathers exercise over sons, and sons over fathers, power which governs their actions, more or less, which we recognize under the name of *influence*. If it be a just exercise of power, a discreet and proper influence, directed to accomplish commendable and lawful ends, it is an

influence to which the law will take no exception, but rather encourages and upholds. If a son, like Bachus Culver, shall remain at home with his father, until the one is seventy-two and the other fifty years of age, giving his time, his skill, the energies of both body and mind to his father's business, to the enlargement of his estate, and the increase of his wealth, and to guide his footsteps in his declining years, asking and taking but little to himself, except such bounty as the father, towards the end, chooses to bestow upon him; and if the parent is so far influenced, by the dutiful and enduring affection of his son, as to make him a special object of his good will, and principal heir of his estate, such influence is just, commendable and according to the course of our nature. If the son should remind the father of his diligence, his industry, his loss of all hope of advancement elsewhere, and point to the large amount of their common acquisitions, and solicit, as an act of common justice, a larger portion of the estate than his brothers and sisters; and the parent should yield to the justice of such representations, here would be an influence exerted by the donee over the mind of the donor, clear, positive and unequivocal. Yet I do not understand it to be *the influence* which the law disapproves and condemns, and for which it will avoid a deed of conveyance or a will. By no means. On the contrary, it will uphold and encourage it, and give effect to it.

The influence which the law not only refuses to recognize, but repudiates, is *undue influence,* denominated *undue* because it is unrighteous, illegal, and designed to perpetrate a wrong. The undue influence exerted to procure the execution of a deed, or a bequest, or devise by will, must amount *to fraud or coercion.* The grantor must be overreached and deceived by some false representation or stratagem, or, by coercion physical or moral.

" There is not the slightest proof," says Mr. Justice JEWETT, in *Blanchard* agt. *Nessle,* (3 *Denio,* 37, 42,) " that I can discover, to show any artifice or fraud having been practiced, or attempted, by any person upon the testator, in regard to the will. It is true, that the defendant's wife wrote a part of the

Davis agt. Culver and Culver.

will; but if there is any reliance on human testimony, it is equally true, that in that she only obeyed with reluctance the command, or complied with the urgent request of her father. It is said, that she dictated the will. If by that is meant, that she reminded her father of what he had, as she stated, before told her in relation to certain of his property, it is true. But does that amount to the exercise of *undue* influence? Influence, persuasion, may be fairly used. A person has a right, by fair argument or persuasion, to induce another to make a will, and even make it in his own favor. The procuring a will to be made by such means is nothing against its validity." (*Miller* agt. *Miller*, 3 *Serg. & Rawle*, 267.)

In *Williams* agt. *Goude*, (1 *Hagg. Eccl. Rep.* 577,) Sir JOHN NICHOLL makes these remarks: "I can find no trace of any unfair importunity on the part of the wife, to induce him to alter his will, or do any testamentary act. Indeed, it would be extraordinary, if the influence of affection and of warm attachment, is to take away the power of benefiting the object of regard. The influence, to vitiate an act, must amount to force or coercion, destroying free agency: it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another, for that would be a strong ground in support of a testamentary act. Further, there must be proof that the act was obtained by this *coercion by importunity that could not be resisted*, that it was done merely for the sake of peace; so that the motive was tantamount to force or fear." (22 *Wend.* 539.)

Looking at the case under consideration in the light of these clear and lucid expositions of the law of undue influence, the evidence fails to establish anything of the kind. There was no fraud, no misrepresentation, no substituting one paper for another, no concealment, no threats, no importunity or even persuasion, that I can discover. The grantor knew well enough what he was doing, and seemed to do what he did with quite the usual and customary degree of intelligence. He was not particularly exposed to the arts and persuasions of the grantee, for they lived in separate houses, and had separate families.

---

Davis agt. Culver and Culver.

---

So far as the testimony discloses, he came to the office of Mr.
William Eno, with whom he had been on friendly terms for
many years, who did ·professional business for him, and gave
directions for the drawing of the deed.   He brought with him
the title deeds with a view to the description of the property;
and he also stated that he had sold the farm to his son for $60
per acre.   The .deed was drawn and executed in Mr. Eno's
presence, who also signed it as a witness, and the grantor then
took it, away with him.   The paper was prepared upon the
exclusive instructions of the grantor, for the grantee was not
present, nor does it appear that he was aware of what was go-
ing on.   At the same time he gave Mr. Eno instructions to
draw up the agreement of the 19th of May, 1848, providing
for the payment of the purchase money : when this was drawn
up, it was read over to him : he took it away with him at the
time he took the deed.   The grantee had nothing to do with
this paper, and seems to have been as unaware of what was
done in regard to it as he was of the execution of the deed.
Four days afterwards the grantor and grantee returned to Mr.
Eno's office, the deed was delivered, the article of agreement
signed, and the transaction consummated.   In all this we see
nothing but what is fair, open, considerate and upright; and
we see, also, that the grantor was the moving party, the princi-
pal actor : he selected the counsel to draw the papers, furnished
the instructions and dictated the terms.   It is possible Bachus
Culver may have instigated all this.   His father may have been
doing no more than executing the instructions of Bachus : in a
word, he may have been the mere clay in the hands of the pot-
ter, to be moulded and fashioned at the grantee's ˙will and
pleasure ; and the deed and the agreement may be, after all,
the deed and the agreement of the grantee, and not of the
grantor.   But where is the evidence of this?   The cause must
be determined on proof, not upon conjecture or suspicion—not
upon what may have been, but upon that which actually ap-
pears from the evidence to be ; and that repels the idea of
fraud or coercion, or the exercise of improper influence.

But it is said, the provisions contained in the article of the

19th of May, 1848, that $10,480 of the purchase money should be paid in extinguishing the debts and notes standing in the name of Bachus and Joshua Culver, was a fraud upon Joshua, or proof at least, that he was overreached and circumvented. I do not see the provisions in this light. The article declares that the parties understand these debts to be the debts of Joshua, and the assertion is abundantly sustained by the evidence. The principal business of the old man was droving and grazing cattle. It was very large, and drove for his benefit, and in his name. The debts to which the agreement refers are those incurred in the course of this same business. It was, therefore, just and legal that Joshua should provide for their payment. That he did so, and required Bachus to pay them out of the purchase money of the farm, to the extent named, is evidence of the *bona fides* of the transaction.

I cannot give my assent to the plaintiff's proposition, that Bachus Culver's relation to his father was fiduciary. He was not the trustee of Joshua. His relation was not that of committee or guardian of his person or estate, nor did he hold any property, real or personal, in trust, in which Joshua had any interest. The one was the son and the other the father, and the son aided in the transaction of the father's affairs. The law in regard to dealings and contracts of sale, where the relations of trust and confidence exist, has no application here.

These considerations lead me to the conclusions, 1st. That Joshua Culver was entirely competent to execute the deed of conveyance under which the defendant claims title. 2d. That the execution of the deed was not obtained by undue influence. 3d. That in respect to the lands claimed, the defendant Bachus Culvert is a purchaser in good faith, and for a valuable consideration. 4th. That the verdict of the jury is not supported by the evidence, and should be set aside; and deeming the case one upon which the defendant is entitled to a new trial, upon the grounds already stated, I omit to notice the exceptions taken to the admission and rejection of the evidence, and to the charge of the court.

The declarations of Joshua Culver, though good evidence upon the question of capacity, are of no value upon that of undue influence.

There should be a new trial. with costs to abide the event.