OF

# THE STATE OF NEW JERSEY.

## OCTOBER TERM, 1889.

————

ALEXANDER T. McGILL, ORDINARY.

ABRAHAM V. VAN FLEET VICE-ORDINARY.

————

In the matter of the propounding for probate a paper writing
purporting to be the last will and testament of FRAZEE LEE,
and another paper purporting to be a codicil thereto.

1. The capacity required for a testamentary act is, that the testator can com-
prehend the property he is about to dispose of, the natural or other objects of
his bounty, the meaning of the business in which he is engaged, the relation of
each of these factors to the others, and the distribution that is made by the
will.

2. Inebriety, although long-continued and resulting occasionally in tempo-
rary insanity, does not require proof of lucid intervals to give validity to the
acts of a drunkard, as is required where general insanity is proved; conse-
quently, where habitual intoxication is shown, there will be no presumption
that there was incapacitating drunkenness at the time the will was made.
Such a condition must be affirmatively proved, or the presumption of capacity
will prevail.

*Mr. William R. Coddington* and *Mr. Theodore Runyon*, for the proponents.

*Mr. R. V. Lindabury*, for Ezra D. and Daniel Hetfield.

*Mr. Garret Berry*, for William H. Randolph.

THE ORDINARY.

The testator, Frazee Lee, died at his residence in Fanwood township, in Union county, on the 11th of August, 1888, at the age of eighty years. On the 9th of July in the same year he executed a paper, which is here offered for probate, as his last will and testament, and on the 21st day of the same month he executed another paper, which is offered as a codicil to that will.

The admission of these papers to probate is resisted upon the ground that at the times when they were respectively executed the testator did not possess testamentary capacity.

The principal contestants are two maternal uncles, who are testator's next of kin; one of them, Ezra D. Hetfield, is ninety-three years of age, and the other, Daniel Hetfield, is ninety. Neither of them was sworn as a witness, and neither of them appears to have taken an active part in this contest. The other contestants are of the blood of the testator's father, and claim an interest in the lands descended from him.

Frazee Lee never married. He had no sisters and only one brother, Daniel H. Lee, who died on July 8th, 1888, at the age of seventy-six years. The brothers lived with their parents until their father died, some thirty or more years ago, and then made their home on a farm with their mother until she died, in 1880. After that they lived together for the remainder of their lives, the younger, Daniel, dying a month before his brother. Their business ventures were, in the main, made jointly, and their property was held in common, even to a joint bank account. The most devoted and brotherly affection existed between them. By close economy and persistent industry, combined with business sagacity, they succeeded in amassing considerable fortunes. The relatives with whom they appear prin-

cipally to have come in contact were William Hetfield, a son of the contestant Daniel Hetfield, Sarah House, a widowed cousin, about fifty-eight years of age, the daughter of Ezra D. Hetfield, the other of the principal contestants, and Maria Garthwaithe, seventy-three years old, a double first cousin whose parents are dead.

William Hetfield lived upon a farm near them and was accustomed at times to render them little services which he calls chores. Mrs. House and Mrs. Garthwaithe at several times of sickness assisted them. It does not appear that these services were paid for or that payment for them was ever demanded. When Mrs. House became a widow, the brothers proposed to her that she should permanently reside with them, but she refused to do so. Early in life the testator became a member of the Scotch Plains Baptist Church, in which his mother was a communicant, but for many years previous to his death failed to attend it and was delinquent in his duties to it. In 1883 a committee, termed a disciplinary committee, was appointed to wait upon him. This committee visited him several times. He represented to it that his health would not admit of his attendance upon church services, and at the same time gave it $20 for the church, and agreed to thereafter contribute $5 towards each semi-annual payment of interest upon the church debt of $5,000. Repeated applications to him for contributions to the church, because of his parsimony, evidently annoyed him. Yet his consideration for it seems to have been such that, instead of rudely refusing to give, he strove to excuse his refusals and to conciliate the church people by promises. To one of these people he said that he would remember the church when he died, if there was anything left. To another he said that he would keep what he had while he lived, and that when he was through with it the people of Scotch Plains church would be very much surprised. To yet another he gave as an excuse, that by strict economy he and his brother had gotten the little together, but it was going like the early dew and the morning cloud. When asked to remember the church when he made his will, he said that when he was done with his property it should be "judiciously invested." There

can be but little doubt that he intended to devote at least a sub-
stantial part of his fortune to good purposes, and that the claims
of the church were conspicuously before him. During the illness
of Daniel Lee, Mr. Parks, the pastor of the Scotch Plains church,
called to see the brothers, and had a conversation with them upon
the subject of religion, and prayed with them. Daniel was not
a member of the church, and was then more seriously ill than
Frazee, consequently Mr. Parks's attention was particularly
directed to him. Both the brothers appear at this time to have
inquired as to the welfare of the church and to have expressed
much interest in it. Neither of them was then confined to his
bed. Perhaps William Hetfield exhibits more strongly than any
other witness the interest that the testator took in the Scotch
Plains church, when, in his testimony, he says that he was im-
pressed that Frazee might leave it enough to pay its $5,000 debt,
but not the bulk of his estate. The testator's remark to a wit-
ness named Manning, who, about the middle of June, 1888,
sought to interest him in a young men's Christian association at
Plainfield, that he hoped, at his death, his money would be used
for good purposes, in the light of subsequent developments, is of
important significance upon the question of testamentary inten-
tion.

In the course of their business dealings the brothers had fre-
quent occasion for the services of lawyers, and became the clients
of Messrs. Jackson & Coddington, a law firm at Plainfield.
The senior member of this firm, Mr. Jackson, for a number of
years preceding their death, advised them in all their legal busi-
ness and difficulties. Two or three years before they died they
talked with him as to the disposition that the law would make
of the property of one of them if he should die, and were ad-
vised that it would go to the survivor of them, and that they
need not make wills unless they desired to make bequests or de-
vises to others. After this advice they apparently dismissed the
subject of will-making from their minds until the summer of
1888. In June of that year Daniel became seriously sick, and
determined to make a will. Whether Frazee reached a similar
conclusion does not distinctly appear, but the indications are

that the brothers determined to make their wills together.   On the 25th of June Frazee wrote to Mr. Jackson as follows:

"June 25th, 1888.

"Mr. John H. Jackson

"*Dear Sir*—We desire you to call and see us between the hours of 2 and 6 p. m. to-morrow if you can conveniently.   If not, as soon after as you can.

"F. and D. H. Lee."

[Endorsed]—" Confidentially to J. H. Jackson."

This letter was delivered by Monroe B. Long, Daniel's physician, to Mr. Coddington on the day it was written.   On the following day, at three o'clock in the afternoon, Mr. Jackson drove out from Plainfield, a distance of three and a half miles, to see the Lees.   He says that he found Daniel lying on a cot in the parlor of their house, and Frazee walking about the room. Frazee shook hands with him, and said that Daniel desired to make a will, and would give Mr. Jackson instructions.   Daniel, who was evidently quite sick, sat up in his cot, and then got up and sat at the table with Mr. Jackson, and gave him instructions for the preparation of his will, which were duly noted in writing. The will was then drawn and read over to Daniel in Frazee's presence, and then executed by Daniel, Doctor Long, who was there, and Mr. Jackson, being the witnesses to it.   Frazee then said that he, also, would have his will drawn, and he then proceeded to give instructions, which were duly noted in writing. His will was then prepared and read to him in Daniel's presence, and executed according to the statutory requirements, in the presence of Mr. Jackson and Doctor Long as witnesses.   To Mr. Jackson both Daniel and Frazee appeared to be in full possession of their faculties.   After the wills were completed and delivered to the brothers, Frazee asked the lawyer what the charge for his services was, and upon being told that it was $10, remonstrated, saying that he had drawn a good many wills himself and had never charged more than twenty-five cents, except upon one occasion, when he had been required to redraft the will three or four times, and then his charge had only been a dollar.   He also inquired about the collection of some interest money that was due to him, and was told that Mr. Coddington had it, and

then he asked whether a chancery suit in which he was interested had been decided, and finally he instructed Mr. Jackson that, as he was not able to go to Plainfield, he wished Jackson to look after his business interests for him.

By his will thus made, Daniel gave $5,000 to a namesake, Daniel Lee Bonnell; $1,250 to Sarah House; $1,250 to Hettie M. Garthwaithe; $500 to William Hetfield; $500 to Henry Hetfield; $250 to Thomas Lee; $500 to the Scotch Plains Baptist Church, to be applied to the payment of its debt, and the residue of his estate to his brother Frazee. Frazee, by his will, gave $5,000 to Frazee Lee Bonnell, who was named for him; $500 to Sarah House; $500 to Hettie M. Garthwaithe; $500 to William Hetfield; $500 to Henry Hetfield; $250 to Thomas Lee; $1,000 to the Scotch Plains Baptist Church, to be applied to the payment of its debt, and the residue of his estate to his brother Daniel, with the proviso that if Daniel, who was then in a much more precarious condition of health than he, should die before him, the residue of the estate should go to the Scotch Plains Baptist Church. Frazee Lee, William Hetfield and Sarah House were named as the executors of Daniel's will, and Daniel Lee, William Hetfield and Sarah House were appointed executors of Frazee's will. The brothers' estates are jointly valued at about $190,000, and separately are nearly equal in value. Daniel died on July the 8th, 1888, and the next day the will now disputed was made. In effect it differs from the will of June 26th only in the provision by which John H. Jackson is named as executor in the place of Daniel Lee. The disputed codicil was made on July 21st, 1888, and its only effect is to appoint Doctor Long as an additional executor and to re-affirm and republish the will of July the 9th.

The object of the contestants undoubtedly is to set aside all three of these testaments, and thus destroy the bequest of the great bulk of the estate to the Scotch Plains church, although at this time the contest is necessarily confined to the two instruments offered for probate—the last will and the codicil to it. If the will of June 26th should be sustained, all that would be gained by setting aside the instruments now assailed would be to

Lee's Case.

deprive Mr. Jackson and Doctor Long of their executorships, and to put the administration of the estate entirely in the hands of William Hetfield and Sarah House.

The sole ground of contest is the alleged incapacity of Frazee Lee to make the instruments in question. It is contended that for a long time he had been intemperate in the use of intoxicants, that his long-continued and excessive indulgence in them had impaired his mental and physical faculties, and that this mental impairment, together with actual intoxication at the very times when the instruments were made, destroyed his testamentary capacity. The bequest to the church, it is insisted, was the outcome of a religious mania to which he was subject when under the immediate influence of intoxication.

I am entirely satisfied by the voluminous proofs that the testator habitually used spirituous liquors, and at times so immoderately that he became intoxicated. But the testimony does not satisfy me that he was an habitual drunkard, or that by continued and excessive indulgence his faculties were impaired to the extent claimed. It has been very clearly shown that for five years before his death he suffered with disease of the heart which is known as angina pectoris, so named from a sense of suffocating contraction or tightening of the chest over the sternum, which causes anguish and fear of sudden death. The disease is marked by sudden attacks of severe pain and fainting sensations. The paroxysms come on unexpectedly after irregular intervals. As the disease continues, the patient's respiration in the intervals between the paroxysms becomes labored, and he not unnaturally seeks temporary relief, not only in stimulants, but also in various and at times ridiculous postures of the body.

Viewing the testimony as to the testator's frequent intoxication in the light of this description of the disease from which he suffered, it becomes at once questionable whether many of the witnesses produced to prove instances of drunkenness may not have mistaken the heart trouble for intoxication. But, however this may be, there is abundant evidence to establish that fixed mental disease did not supervene from the testator's frequent or occasional inebriety.

Daniel J. Marshall, a witness for the contestants, says that the testator was one of the soundest men when he was sober. To Joseph A. Cutter, who saw him frequently during a negotiation for the purchase of some real estate in the fall of 1887, he always appeared to be a sober, competent business man. Job Male, the mayor of Plainfield, frequently spoke to the testator as he passed through the streets of that town, but never noticed that he was intoxicated, and in a business transaction, in March, 1888, found him to be capable and clear-headed. Nelson Runyon speaks of a similar experience with the testator. George Kyte and Charles A. Smith speak of an interview with him on the 22d of May, 1888, at which the testator calculated interest, repeated the form of an acknowledgment to a release, and carried on a long and intelligent conversation with them. Thomas Lee refers to the testator's bargaining with him for the sale of a field of growing wheat on July 9th, the very day on which the disputed will was made, and Charles A. Smith instances a visit to the testator on July 18th, at which the testator reminded him that he had failed to render a bill for a keg of nails which the testator had purchased from him eighteen months before their interview, and also urged upon him the importance of seeing that all the testator's policies of insurance were kept in force. Besides this and other like testimony, business letters written by the testator in the spring of 1888, and his account-book showing entries up to July of that year, including the receipt of two checks, one dated June 27th, 1888, and the other dated July 3d in the same year, attest a general business capacity.

It cannot be said, in the face of all the evidence of this character, that the testator lacked mental capacity, when sober, to efficiently and intelligently transact business.

It is clear that permanent insanity or incapacity was not induced by the testator's habits. It is established that inebriety, although long-continued and resulting occasionally in temporary insanity, does not require proof of lucid intervals to give validity to the acts of a drunkard, as is required where general insanity is proved. Consequently, where habitual intoxication is shown, there will be no presumption that there was incapacitating drunk-

enness at the time of making the will. Such a condition must be made affirmatively to appear, or the presumption of capacity will prevail. *Ayrey* v. *Hill, 2 Add. 206 ; Gardner* v. *Gardner, 22 Wend. 526 ; Redf. Am. Cas. Wills 206 ; Whitenack* v. *Stryker, 1 Gr. Ch. 8 ; Lowe* v. *Williamson, 1 Gr. Ch. 82 ; Goble* v. *Grant, 2 Gr. Ch. 629 ; Turner* v. *Cheeseman, 2 McCart. 243 ; Kahl* v. *Schober, 8 Stew. Eq. 461 ; Bannister* v. *Jackson, 18 Stew. Eq. 702.*

It may be stated as the established rule in this State, that the capacity requisite for a testamentary act is that the testator can comprehend the property he is about to dispose of, the natural or other objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the others, and the distribution that is made by the will. *Den* v. *Van Cleve, 2 South. *589, *662 ; Stephens* v. *Van Cleve, 4 Wash. C. C. 262 ; Stackhouse* v. *Horton, 2 McCart. 205 ; Boylan* v. *Meeker, 4 Dutch. 277 ; Rusling* v. *Rusling, 9 Stew. Eq. 607 ; Stoutenburg* v. *Hopkins, 16 Stew. Eq. 577; Waddington* v. *Buzby, 18 Stew. Eq. 173.*

It is, then, necessary to determine, as a question of fact, whether the proofs show that, at the times of the execution of the disputed papers, Frazee Lee did not possess testamentary capacity. In such an inquiry, the court must weigh the testimony of the witnesses produced, and give to each the credit to which he or she may be entitled. The interest, intelligence, ignorance or bias of witnesses, the influences to which they may be subjected, their opportunities for observation, their memory, and the like, are conditions to be weighed in reaching a just conclusion as to the credit which is due to them. While the court will expect material assistance from the attesting witnesses, upon the law's theory that they are placed around the testator to protect him from fraud and to ascertain and judge of his capacity, it cannot place reliance upon their testimony without subjecting it to all tests of credibility. "Our experience," says Chancellor Williamson, in *Garrison* v. *Garrison's Exrs., 2 McCart. 269,* "in these matters, is sufficient to satisfy us that the subscribing witnesses seldom or ever take any pains to ascertain the capacity of the testator, and are generally

those who know least of his general character and disposition or
of his mental capacity. As a general thing, very little regard is
paid by the testator to the character of the individuals who are
called upon as the attesting witnesses to this most solemn and
important act. Their duty is discharged by their formal attesta-
tion of the instrument, and any effort on their part to ascertain
the state of mind of the testator, or the fact whether he was the
dupe of others who were more active in the transaction and upon
whom the testator was reposing his confidence, would be regarded
as inquisitive and as an unwarrantable interference with matters
that did not concern them. The opinion of a witness who is a
stranger to the testator, and who sees or hears nothing, except
what is necessary to enable him to attest the instrument as a sub-
scribing witness, is not as much to be relied upon as that of a
neighbor and familiar acquaintance of the testator. The truth
is, the opinion of neither is of any weight with the court, except
as it proves itself to be a correct and sound conclusion from facts
which justify and warrant it. A man who will subscribe an
instrument attesting that the testator is of sound mind, memory
and understanding, and then repudiate under oath his own attes-
tation, does not occupy a position that will justify a court in
giving any weight to his mere opinion. A will may be sustained,
although all the subscribing witnesses depose to the incapacity
of the deceased."

In examining the testimony as to the condition of the testator
at the times when he executed the wills and codicil in this case,
I will first regard that which is directed to the will of June 26th,
not for the purpose of determining whether that will should be
admitted to probate, for that issue is not before me, but to see
whether it indicates a testamentary intention antedating the
making of the disputed instruments.

It has been urged, with considerable force, that the court should
suspiciously scrutinize a testament by which the bulk of a large
estate is given to religious purposes upon the eve of the testator's
life, and when the prospect of immediate dissolution is before him.

In England, and in some parts of this country, such testaments
have been prohibited by statute, and it is insisted that the reasons

which animate such legislation should at least excite our courts to suspicious care. In the exercise of the care thus solicited, I deem it to be most important to have recourse to all that will throw light upon the desire and intention of the testator. If it should clearly appear that the will of June 26th was a deliberate testamentary act, that fact must, to some extent, influence the consideration of the validity of the succeeding instruments, for they appear, upon their face, to be little more than an adaptation of that will to the new situation created by the death of Daniel Lee. As to that will, the testimony of Mr. Jackson has been already stated. The testimony of Doctor Long fully corroborates Mr. Jackson. Mrs. Garthwaithe states that in the morning of that day the testator drank freely, and that she saw him fall as he crossed the yard, and that Daniel then expressed regret that his brother was drinking, because he said they expected some gentlemen in the afternoon to do writing for them. She states that after Doctor Long and Mr. Jackson left, that day, the testator was drunk, and that during the night he raved in delirium. Mrs. House corroborates this witness. Yet neither of these women states how early in the morning the testator drank, or at what hour he fell in the yard, or that the fall was a consequence of intoxication, nor do they say how soon after Mr. Jackson and Doctor Long left the intoxication was noticed. Indeed, there is nothing so irreconcilable between their statements and those of Doctor Long and Mr. Jackson as to necessitate a criticism that would characterize any one of the four of the witnesses as unworthy of belief. The testimony as to the fall in the yard is of such an uncertain character that that occurrence may as well be attributed to accident or paroxysms of the heart disease, as to intoxication. Even if it were due to drunkenness, it does not appear that there was not sufficient time after it, and before three o'clock, when Mr. Jackson and Doctor Long arrived, to enable the testator to recover his reason.

The testimony as to the execution of this will I think affirmatively shows ample testamentary capacity. The testator's shrewdness, when the charge of $10 was mentioned, and the consideration and memory which he evinced by his inquiries as to

the collection of interest then due to him, and as to the progress of his chancery suit, added to his admonition to his attorney to look after his business affairs, abundantly satisfy me upon this point.

This will was not inconsonant with the testator's natural and moral duties. He had none but collateral kindred, and of those but three appear to have paid him attention, and those three were substantially remembered in the will. To William Hetfield he gave $500 in addition to the $500 that had been given to him by Daniel, and to Mrs. Garthwaithe and Mrs. House he gave $500 each in addition to $1,250 that Daniel gave to each of them. He also remembered a namesake, Frazee Lee Bonnell, by providing for him a large legacy, and he was not unmindful of Henry Hetfield and Thomas Lee, two others of his kinsmen. To one of the witnesses he gave a reason for the amount of his bequest to Mrs. House by saying that she had no children and that he considered his bequest to her an ample one. It is said that his gifts to these relatives should have been more generous; but the testator made the will, and he had the right to determine how far his generosity to them should extend. The important circumstance now is the fact that he remembered them, and exercised his judgment and will with respect to them. If we go into a calculation of how much they were entitled to for their services to the testator, it will appear that, at liberal rates, they would each have been more than doubly paid for all services that the evidence shows they ever rendered him.

Taking the will of June 26th, then, as a valid testamentary act, we come to the will of July 9th, with the knowledge that within two weeks the testator had solemnly declared an intention which is not inconsistent with that which is expressed in the instrument of July 9th—a fact that apparently militates against the theory suggested by the caveators, that the instrument was made under the pressure of "an imaginary duty or a baseless religious dream." It appears that upon the 2d of July the testator became so seriously ill as to require Doctor Long's constant care. What the precise ailment then was has been one of the

mooted questions in this case. Upon the one hand, it is contended that it was heart trouble; and upon the other, it is insisted that it was complete nervous prostration, induced by protracted and excessive use of intoxicants, accompanied by frequent delirium. But for the fact that Doctor Long is interested as an executor in sustaining these testamentary acts, his testimony would be decisive upon this point. Yet, without it, from the lips of the witnesses of the caveators, the fact that the testator suffered from heart disease is fully established. They say directly that he had heart trouble; that he crawled instead of walked; that he cried out in sudden agony; that he complained that he could not get his breath; that at times he almost lost consciousness in paroxysms of pain, and that when gasping for breath he would call for stimulants, saying that without them he would die. I have no doubt that his excessive indulgence in intoxicants complicated his trouble, and it may be that, at times, they were the direct cause of temporary delirium; but it is clear, beyond doubt, that many of his actions and exclamations, relied upon as evidences of intoxication, were the outcome of the paroxysms of suffering.

On Sunday evening, the 8th of July, as Mr. Jackson was driving past the house in which the Lees lived, he stopped to inquire how they were. He saw William Hetfield in the yard, and asked if he could see the brothers, and as he entered the kitchen was directed by Mrs. Garthwaithe to the parlor. Frazee was not there, but Daniel lay upon his cot. When he went up to Daniel, Mr. Jackson discovered that he was dead. Mrs. Garthwaithe and William Hetfield were called, and Hetfield called Frazee Lee. When Frazee came in he tried to arouse his brother, and called, "Daniel! Daniel!" and getting no response said, "Daniel's gone." Mr. Jackson says that the testator was much affected by grief at this time, but that he appeared to be entirely sober and mentally sound. Before Jackson left he asked Frazee what undertaker he would have, and Frazee answered, "Mr. Ryno, of Rahway. He buried my mother, and I would prefer to have him bury Daniel." As to this occurrence, there is no material contradiction among the witnesses. William Het-

field states that when he went to call Frazee from the adjoining room, he beckoned to him, and Frazee said, "What do you want?" to which Hetfield replied, "Jackson is here." Frazee then got up and sat upon the side of his bed, and said, "Let me rest a little," and then, coming into the parlor, said, "Is Daniel worse?" He then looked at his brother and said, "Daniel's gone." He then took hold of Daniel's clothing and said, "Daniel!" and again, in a louder tone, "Daniel!" and then, "Oh, he is gone." The witness said there was then such a scene that he turned his head away. This witness does not remember whether Jackson then conversed with Frazee or not. Mrs. Garthwaithe says that an hour after this she found that Frazee had crawled to her bedroom, where the whiskey was kept. William Hetfield, Mrs. House and Mrs. Garthwaithe unite in saying that through the succeeding night the testator sleeplessly raved in delirium. Andrew J. Ryno, a neighbor, says while he was there that evening the testator mourned aloud and frequently called for whiskey. The next morning very early, Mrs. Garthwaithe and Mrs. House say they asked Frazee whether Mr. Ryno, the undertaker, should be sent for, and that then Frazee's mind wandered so that he insisted his dead mother was present. Mrs. House and William Hetfield say that later, between seven and eight o'clock, they spoke with the testator, and then his mind appeared to be clear. Hetfield says Frazee at that time said, "There is more than $100,000 between you and her, and you have the settling of my estate. You and she have. Take good care of your mother, and I want all your care and attention." Mrs. House gives the language then used as follows: "There is $100,000 for you and William, and I want you to take the best care of me." Later in her testimony, and seemingly in contradiction of her former testimony, Mrs. House says that then she did not consider that Frazee's mind was entirely clear. At eight o'clock Daniel K. Ryno and his son, undertakers, for whom Mrs. Garthwaithe had gone to Rahway, a distance of five miles, arrived. To the junior Ryno the testator did not seem rational. He lay upon his bed moaning and murmuring, "Our Lord," "Jesus Christ," and similar expressions. The senior Ryno says

that after Frazee was aroused he asked him if he had anything to say with reference to Daniel's funeral, and Frazee answered, " Yes," and added that he did not wish any unnecessary expense, but he desired the gloves to be good large ones, and desired the undertaker to do the best he could, adding that he was suffering great bodily pain and could not think. Mr. Ryno says that he spoke with difficulty, but that his thought was right when it was uttered. William Hetfield states that on that day (he does not give the hour) the testator instructed him to care for the horse that the testator was accustomed to drive, and also that he heard the testator tell Ryno where his lot in Hazlewood Cemetery was situated. Both William Hetfield and Mrs. Garthwaithe corroborate Mr. Ryno's testimony as to Ryno's conversation with the testator. Between nine and ten o'clock that morning Mr. Jackson and Doctor Long arrived together from Plainfield, and after waiting a few minutes in the kitchen went in to see Frazee. Mr. Jackson says Frazee was grieving about his brother, and at intervals seemed to be in pain, but that his mind appeared to be " all right;" that Frazee shook hands with him and said, " Daniel's gone;" that he, Jackson, asked if he could be of assistance in arranging the funeral, and was told by the testator that the arrangements were completed. He says the testator then said to him, " Now Daniel is gone some changes will be needed in the will, but I think I will defer it for a few days;" that the witness then went into the kitchen, where Mrs. House and Doctor Long were, and stated what the testator had said to him, and thereupon the doctor suggested that if a change was desired it should be made without delay, because delay for one in the testator's condition would be dangerous; that the doctor and Jackson then went to Frazee, and the doctor told him that delay in changing the will would be dangerous, and the testator then asked for his former will, and had Mr. Jackson read it to him. Mr. Jackson further says: " When I came to the clause in the will which left $1,000 to the Scotch Plains Baptist Church to pay its debts, he said that would come out, as now he meant to leave all the balance to them, to be used in spreading the gospel." When the names of the executors to the will were read, Frazee

said, "Some one will have to be put in Daniel's place." Doctor Long then asked whom he could have in Daniel's place, and the testator answered, "There is Henry Hetneld," and after a pause, during which the testator seemed to be thinking, Long said, "Well, who will it be, then?" and the testator replied, "John H. Jackson." After the new will was prepared, the testator said that Doctor Long should be a witness, and when he was told that no one was about there who would do for the other witness but John Soden, he said that Soden should be that witness. At the execution he repeated the words, "I publish and declare this to be my last will and testament," in response to Mr. Jackson's question whether he published and declared the instrument to be his last will and testament; and when asked if he desired Long and Soden to be witnesses to the will, he replied, "Yes." Mr. Jackson further states that, in order to hear the testator at first, he was obliged to put his head down to within about two feet of the testator's mouth, but after they had talked a little the testator's speech improved. Doctor Long substantially corroborates Jackson's testimony. John Soden, the second witness to the will, was a farm laborer. He says that he was with the testator for three or four hours from six o'clock in the morning, and during that time the testator appeared to be wandering in his mind, going from one subject to another, and articulating so indistinctly that he could not be understood. He states that the testator replied merely "yes" when he was interrogated as to whether he published and declared the instrument to be his will, and expresses the opinion that the testator was not fit that morning to do business. The cross-examination of this witness exhibits that he was strongly biased in favor of the contestants. His emphatic declaration that he would not sell his oath does not assure me that implicit reliance should be placed in his statements. William Hetfield says he accompanied Jackson to Frazee's room, and that they both went up close to Frazee, and Jackson put his ear to Frazee's mouth, and, after talking to him, asked the witness if he could understand what Frazee said, and the witness replied, "Not much." He could understand very little, perhaps one out of half a dozen words. The

testator's tongue seemed to be thick. He appeared to try to whisper, and the witness thought that he said that he wanted to delay the business for two or three days. Doctor Long then went up to him and felt his pulse, and then stepped back after a moment and said, " He will do." The doctor then said to the witness, " I guess you might as well go out of the room," and the witness went out, saying as he did so, " If he undertakes to make a will to-day what good will it be?" (Doctor Long denies that he sent the witness out of the room, or that he heard the witness ask what good a will made upon that day would be.) Hetfield further says that after Mr. Jackson and Doctor Long left, Frazee talked so that he could understand him very plainly, but that he soon thereafter appeared to be stupefied. Thomas Lee says that, prior to Daniel's death, Frazee wanted to sell him two acres of growing wheat, but that they did not conclude a bargain until the afternoon of July 9th. That afternoon he called to see Frazee, and Frazee again suggested the sale of the wheat, and said it should be worth $30. The witness said that he had no money to pay for it, but Frazee said, " Go on and cut it." The witness adds that the price asked was so high that all the profit he expected for his work was the straw.

Mrs. Garthwaithe does not attempt to detail the circumstances which attended the making of this will. Mrs. House, in substance, corroborates William Hetfield. She says that after Hetfield left the room she went back and forth during the making of the will and gave Frazee the whiskey bottle, which he called for three times, and put to his mouth. Mrs. House, William Hetfield and Mrs. Garthwaithe testify that the next night the testator was again in delirium. On Tuesday, the 10th of July, he was so much better that he took nourishment. Speaking of Tuesday, William Cleaver, whose wife is related to the testator, says that Frazee was very weak, he thinks too weak to make a will, but he shook hands with the witness and his wife and said, " How do you do? I must lie down." After that he heard Frazee moan, as if in pain. On Wednesday, the day of Daniel's funeral, Mr. Parks, the pastor of the Scotch Plains church, came to the house, and, before the funeral services, went into Frazee's

14

room, adjoining the parlor, and had a conversation with him, during which Frazee said that he was glad that Mr. Parks had come; that he desired to hear the funeral exercises, and in order that he might hear them he wished the door from his room to the parlor to be left ajar. After the exercises, Mr. Parks again went to the testator's room, and asked whether the exercises had been too much for his physical strength, to which Frazee replied, "Oh, no, I have enjoyed them very much and I thank you; I am grateful to you for having come, and now I am not able to go to the grave and I request that you go."

As to the execution of the disputed codicil, Mr. Coddington says, that on the morning of July 21st, Doctor Long called at his office and stated that Mr. Lee desired to see him, if Mr. Jackson had not returned from Kentucky, and the witness drove out to Lee's house with the doctor. When he entered the testator's room Frazee was lying down, but he spoke to the witness and shook hands with him, and asked if Mr. Jackson had returned yet. He then spoke about the death of his brother Daniel, and after some conversation upon that subject, asked if the witness had his will and would read it. Mr. Coddington then read the will of July 9th aloud, and when he came to the bequest to Frazee Lee Bonnell, read $500 for $5,000, and the testator immediately stopped him, saying, "What is that?" and the witness corrected his mistake. When the reading was finished, Frazee asked for Daniel's will, and upon the witness replying that he did not have it, Frazee said, "I am uncertain as to the amount that Daniel left to Thomas Lee in his will, and I would like to know that amount." The witness then returned to his office in Plainfield and got Daniel's will in his safe, and in the afternoon returned to the testator and read that will over to him, and then read the testator's own will to him again. After the wills were read, the testator stated that the bequest to Thomas Lee was as he remembered it. He added that he had been thinking of appointing another executor, and desired to know if it could be done without affecting the will, and upon being assured that it could be done by codicil without impairing the validity of the will, he said "William Hetfield is a dear friend

of mine and I am a friend of his, but he has one fault, that is, he tips the cup too much. I am thinking that probably the estate could be better controlled by having another executor." The witness asked whom he would have as the additional executor, and he replied "Doctor Long." The witness drew the codicil. Mr. Thoms was called as a witness, and it was executed in the presence of Thoms and Coddington. When the testator came to sign his name he sat up in bed and wrote upon a book. The ink in the pen did not flow freely, and he asked if there was any ink in it, and Doctor Long, who was present, told him it would come all right if he would try again, and he did try again and wrote his name. When Mr. Coddington bade him good-bye, the testator was talking to Mr. Thoms. He told Mr. Coddington to take care of the wills and codicil, and added, " I shall look to you and expect that you and Mr. Jackson will see that my wishes in this matter are carried out." Mr. Coddington states that in the morning the testator's voice was at first indistinct, but, as the interview lasted, it became clear and easily understood, and in the afternoon he sat four feet away and plainly heard all that the testator said. He did not notice either mumbling of words or confusion of ideas. William Thoms, the other witness to the codicil, is a carpenter by trade. He says that he was called in by Doctor Long, who told him that Mr. Lee wished him to come and witness a writing; that some friends had gone back on him and he wanted to make a little alteration; that he signed where Mr. Coddington told him to sign; that he heard Mr. Coddington say to the testator, " Do you declare this to be your last will? " or something to that effect, but he did not hear the testator talk as is narrated by Coddington, except when Coddington was going away, and then Mr. Coddington asked whether he should take care of the wills or leave them with the testator, and the testator replied that Mr. Coddington had better take care of them, and he, the witness, remarked that they could not be left in better hands. He says that the testator seemed to him to be dazed. When the witness came in and asked how he was, he, the testator, put his hand to his head and exclaimed, " Such distress, such distress." When Doctor Long and Mr. Coddington bade

the testator good-bye and went away, the testator seemed to "go-off," as the witness expresses it, and put up his finger and said, "There, what's that? what's that?" The witness gives it as his opinion that the testator was not able to make a will that day, and says that he did not suppose he was witnessing a testamentary act. He thought, he says, that he was "merely witnessing a signature." The cross-examination of this witness developes the fact that previous to giving his testimony he was in company with the friends of the contestants; that he was voluntarily interviewed by their lawyer, and that he declared he had been subpœnaed upon the wrong side. It is noticeable that he swears that he heard Mr. Coddington ask the testator whether he declared the instrument to be his last will, and that he recommended Mr. Coddington as a safe custodian, and that, at the same time, he declares that he did not know he was attesting a testamentary act, but thought he was merely witnessing a signature. His testimony thus appears to be contradictory. But taking it as true that he failed to comprehend the character of the instrument after an express declaration of its nature, that fact itself betrays gross stupidity upon his part. He does not better his position by stating that he supposed he was merely witnessing a signature. A signature to what? The fact that he was willing to attest the signature of a dazed and delirious man to a document so important as to need a safe custodian, in itself evinces his moral weakness. Mrs. House says that when the codicil was executed she was in the room sitting on the floor, less than a foot from the testator. That the testator did not talk as Mr. Coddington says he did. When she was asked how Mr. Coddington succeeded in getting anything from Frazee, she answered, "I might have interpreted, I might not; I don't remember if I did." She says the testator wandered in his mind, and that, pointing to the wall as Mr. Coddington read, he exclaimed, "What is that? what's that?" and afterwards said, "Show me, show me, show me." The witness and Mrs. Garthwaithe explain that the words "show me" had reference to a proposition that the testator had made to them, that they should exhibit their persons to him. After the proposition was made,

they say, he would catch at their ankles and frequently say "Show me." Upon cross-examination this witness says that as Mr. Coddington spoke to Frazee she saw Frazee's lips move, but she could not understand him. She further states that he was sitting up in bed, and that he took the pen and moved his fingers, but that she is near-sighted and did not see him write. Also, that she was out of the room about some two or three times, but she thinks she was not out of the room at any time long enough for Mr. Coddington to read Daniel's will without her knowing it.

This is substantially all the testimony bearing upon the execution of the will of July 9th, and the codicil of July 21st. It is apparent from it that the testimony of the witnesses can with difficulty be reconciled, and it becomes necessary, if none of the testimony is to be rejected as unworthy of belief, that it shall at least be read in the light of the interest that the witnesses have in the event of this controversy.

If the wills and codicil should be set aside, the aged fathers of Sarah House and William Hetfield will divide the entire personal estate, valued at about $90,000, between them, and share largely in the real estate, which is worth $100,000 more, and, in the course of nature, Sarah and William must very soon profit by their fathers' success. Mrs. Garthwaithe is less interested in the event of the controversy. That which she may expect to gain by the rejection of the will is limited to a portion of the testator's real estate. Mr. Jackson and Doctor Long have pecuniary interest to the extent of their commissions as executors, and Mr. Coddington is said to be influenced in his testimony by the fact that he is engaged as counsel for the proponents in this contest. With the exception of Thoms and Soden, these are the only witnesses who tell of the testator's condition at the very times when the disputed papers were made.

Messrs. Jackson, Long and Coddington are all professional gentlemen of excellent repute and standing. I can hardly conceive that they would deliberately perjure themselves under any circumstances, much less under those here existing. They gave the business in which the testator was engaged their undivided

attention, and understood and fully appreciated its nature, and the capacity required of the testator to transact it. Besides this, they each had had a long previous acquaintance with his character, habits and strength, hence it would seem to be impossible for them to mistake appearances. To refuse to credit their testimony, then, is tantamount to charging them with deliberate perjury. Their characters, intelligence, manner of testifying, inconsiderable interest in the event of this contest, and circumstantial corroboration, alike forbid this conclusion.

The natural appearance of the testator's signatures to the disputed papers must have an important place in this consideration, when it is remembered that the contestants would have it believed that when they were made he was suffering with *delirium tremens,* and that his hand constantly trembled. Upon comparison of the signature to this will and codicil with the testator's usual signature, I fail to note that they lack in either strength or character. The only weakness to be detected in them is in an evident ineffectual effort to start them, but that misfortune frequently is attributable to the pen, or the way in which the pen is charged with ink. The evidence here discloses that when the codicil was signed the ink did not flow freely from the pen, and that Mr. Coddington was obliged to recharge it. It was most natural and proper that Mr..Jackson, who perhaps knew more about the testator's business than any other living man, should be made an executor in the place of the dead brother, and it was not amiss that Doctor Long should also be given a place in the administration of the estate, if William Hetfield, by his intemperance, had forfeited the testator's full confidence. The evidence indicates that this charge of intemperance may not have been without foundation. Hetfield himself admits that a short time before the testator died he was locked up for drunkenness, and that at the time of Frazee's death he was in a liquor saloon at Plainfield.

It is noticeable, from the testimony as to the occurrences on the 9th of July, 1888, the day when the disputed will was made, that as the day advanced the testator gradually became stronger and more rational. Very early in the morning his mind

wandered, so that it was with difficulty that Mrs. Garthwaithe could get authority to summon the undertaker from Rahway. Later, though still somewhat wandering in mind, he told Mrs. House and William Hetfield that there was $100,000 between them. So indefinitely did he then express himself that what he said has given rise to dispute whether he is correctly reported, and, if he is, whether he referred to the executorship of Mrs. House and William Hetfield or to a testamentary intention in their favor. Later, yet with difficulty, he gave intelligent instruction to the undertaker, though then, when left to himself, he would moan and call upon the Lord. An hour and a half later he clearly and intelligently received Mr. Jackson, and a half an hour or more after that he executed the will. In the afternoon he shrewdly bargained with Thomas Lee. That night, it is said, he was again delirious, but the next day he was better, and on Wednesday he kept the door of his room ajar to hear the exercises at Daniel's funeral.

On the 18th of July, three days before the codicil was made, the testator had a long business interview with Charles A. Smith, at which he gave every evidence of capacity. About that time he expressed a desire to see Mr. Jackson, who was in Kentucky. On the 21st, not longer waiting for Mr. Jackson, he sent for Mr. Coddington, and made the codicil. On the 23d, two days after the codicil was executed, his condition was such that William Hetfield and Mrs. House did not refuse to join with him in a petition for the admission of Daniel's will to probate, or to join with him in an affidavit verifying that petition, and in the oath of the executors of Daniel's will, when that oath was administered, and the surrogate did not refuse to twice swear him and to issue letters testamentary to him.

In giving credence to the testimony of Messrs. Jackson, Coddington and Long, I do not necessarily entirely discredit Mrs. House, Mrs. Garthwaithe and William Hetfield. They are comparatively poor. The rejection of the papers in dispute and the will of June 26th will materially change their conditions in life, hence their interest is apt to influence them, unconsciously perhaps, to color circumstances that favor their contention and to

regard as unimportant those which militate against it. Making allowance for the exaggerations and inaccuracies which an interest so material is apt to produce, their testimony has been carefully considered. It exhibits that none of them were continuously present at the execution of either the will or the codicil; that when they were present that which was being done did not engage their undivided attention, and that in several instances their memory is confessedly in fault upon points of the gravest importance. In short, I think that it is insufficient to countervail the testimony of Messrs. Jackson, Long and Coddington.

The burden of proof is with the contestants, and they have not successfully borne it.

In reaching this conclusion, I have not lost sight of the fact that Mr. Jackson was the confidential adviser of the testator and the draftsman of the will that made him an executor, and that Doctor Long was the testator's physician, and present when the codicil which appointed him an executor was prepared. Such facts are well recognized by the authorities as *indicia* of undue influence, and they have not escaped my attention and careful scrutiny. I think that they have been fully and satisfactorily explained.

I will admit the will and codicil to probate.