*(Surrogate's Court, New York County.*   September, 1890.)

1. WILLS—UNDUE INFLUENCE—WILL WRITTEN BY LEGATEE.

An habitual drunkard, who had been so found by a jury and twice confined in a state asylum for the insane on that account, made his will in favor of a nephew, who was a lawyer, and who, at testator's request, drew it for him.   Later he made a second will, in favor of other members of his family who had made a home for him, but, becoming impatient of home restraint, he left them to resume his drunken habits, which resulted in his detention in a workhouse.   On discharge he went to his nephew's, who took him in, and the following day he duly executed his will, drafted, as before, by the nephew, making him sole legatee.   The witnesses to the will deposed to testator being sober and rational at the time, and, although it was not read over to him, the evidence sufficiently justified the belief that he knew its contents, and till his death, $2\frac{1}{2}$ years later, testator's declarations showed that it conformed to his wishes, and his gratitude for his nephew's kindness.   *Held*, that the presumption of undue influence, by reason of the nephew's drafting this last will, was removed.

2. SAME—CAPACITY TO MAKE—HABITUAL DRUNKARD.

A drunkard, even if at the time under the influence of liquor, may make a valid will, if he comprehends the nature, extent, and disposition of his estate, his relations to those who have or might have a claim on his bounty, and is free from undue influence, fraud, or coercion.

Application for probate of a paper purporting to be the last will of William A. Reed, deceased.   John O. S. Reed and another opposed the application. Probate decree granted.

*Alfred W. Kiddle*, for proponent.   *William P. Wilson*, for contestants.   *Julius M. Mayer*, for legatee.   *E. J. Knauer*, special guardian.

RANSOM, S.   The paper propounded as the will was executed June 16, 1887. By it the decedent bequeaths his estate to a nephew, T. Eugene Smith.   Objections were filed by John O. S. Reed, a nephew, and by the special guardian of Margaret E. Reed, a niece, who are named as legatees under a will executed on the 22d of March, 1887, less than three months before.   The objections alleged are nonexecution, mental incompetency, circumvention, undue influence, constraint, and coercion.   The instrument was properly executed.   Each subscribing witness testifies to facts essential to the execution, though there are slight differences of statement as to the manner in which the declaration was made.   While Salmon, one of the witnesses, first swore that the word "will" was not used at the time, he afterwards recollected that it was.   It does not appear that the paper was read to or by the decedent at the time, but there is sufficient evidence in the case to justify the belief that he knew its contents. The allegation of mental incompetency is based upon the fact that the decedent was addicted to the excessive use of intoxicating liquors, of which there is abundant proof, his appetite being so strong that at times he was power-

less to resist it, and at different periods in the latter part of his life, by reason of his weakness, he was arrested and committed to public institutions. He died December 28, 1889.

A drunkard may make a valid will, even if at the time of the execution of the instrument he is under the influence of liquor, provided he comprehends the nature, extent, and the disposition of his estate, his relations to those who have or might have a claim upon his bounty, and is free from undue influence, fraud, or coercion. *Peck* v. *Cary*, 27 N. Y. 9; *Gardner* v. *Gardner*, 22 Wend. 526; *Van Wyck* v. *Brasher*, 81 N. Y. 260. The testimony of the subscribing witness Salmon is that the testator was, at the time the will was executed, quietly and neatly attired, presented a good appearance, seemed perfectly rational, and he discovered no odor of liquor about him, and saw nothing to lead him to doubt that he was perfectly sober. The witness was a student in the law office of Smith & Vosburgh, of which firm the sole legatee was a member. He had seen the decedent previously, but he had no acquaintance with him. Spillane, the other witness, was a notary public, having an office in the same building, and he had known the decedent by sight, having often seen him going up and down in the elevator, and he states that he appeared to be "perfectly rational, a decent and respectable looking man, and a gentleman." The facts that transpired on the occasion of the execution are consistent with the inferences of the two witnesses. It is certain that for about three weeks previously he had had no opportunity to indulge in liquor, as he was confined in an institution until the day before the paper was executed.

But the question of his habits of drinking has an important bearing in considering the allegation of undue influence in the procurement of the will, and in this aspect I must consider the extent to which he was addicted to the vice. In July, 1884, he took up his residence at El Mora, N. J., with Mrs. Reed, the widow of his brother, and he remained there much of the time until the early part of May, 1887. Mrs. Reed testifies that he would go on protracted sprees. In July, 1885, a judicial inquiry was had in respect to his habits, and on August 14th of that year a jury found him to be an habitual drunkard, and incapable of controlling and managing himself, and that he had been so for two years. These proceedings were confirmed on the 25th of that month, and subsequently letters of guardianship were issued to Mrs. Reed's son, John O. S. Reed, one of the contestants, on whose application the chancellor, on December 26, 1885, directed the guardian to place him in a state asylum for the insane. He was subsequently released on trial, June 8, 1886. Later in the same month further application was made to the chancellor by the guardian, setting forth that since his release the decedent had been continuously intoxicated, had lost his clothing, and was unable to take care of himself, and praying for a decree to commit him to the state asylum at Morris Plains. In support of the petition was the affidavit of T. Eugene Smith, the sole legatee under the will in question, stating that, on the 19th of June, the deceased had appeared at his residence in an intoxicated condition, and had been continuously intoxicated since; had pledged his clothing; and deponent believed him to be utterly incompetent to take care of himself. On June 24, 1886, he was committed to the asylum until the further order of the court. Mrs. Reed states that in the early part of May, 1887, the decedent left her house in an intoxicated condition. On the 8th of May, as appears by official records, he was committed to the workhouse on Blackwell's island for 10 days for intoxication, and was discharged May 17th. He stated at the time of his commitment he was born in the United States, was a clerk by occupation, single, a Protestant, 44 years of age, and had been committed five times previously. The records of the workhouse show, also, that on May 25th one Michael Reardon was committed, in default of $400 bail, for disorderly conduct, for one month, but was discharged June 15th. This was the day pre-

ceding the date of the will. He gave his residence as Elizabeth, his occupation that of teacher, single, a Protestant, 44 years of age, and he stated that he had been committed four times previously. The identity of the decedent with Reardon seems established by his own statement to Eugene Smith, that he had been committed to the island under the name of Michael R. Smith, remembering only the initial letter of the last name, but the description of his profession, his age and residence, conforms generally to the facts shown in the case, and I have no doubt that Reardon and Reed were one and the same. Subsequently, in the summer of 1887, the decedent fractured his leg, and was at the house of Eugene Smith's father. When he had sufficiently recovered, during the absence of Mrs. Smith in Europe, he purchased the supplies for the household, and the uniform testimony is that he continued sober until the 1st day of October, 1887, when the witness Palmiera, a student in the office of Smith & Vosburgh, first saw him, and thenceforward Palmiera states that he never saw him when he was not under the influence of liquor, and Smith himself testifies that the decedent was drunk about Thanksgiving time of that year. I find no satisfactory evidence of his being much addicted to drink thereafter until the summer of 1888. In September of that year he called, when intoxicated, on Mrs. Reed, at her home in New Jersey, but remained only one night. He desired to be taken care of, but the family declined on account of his habits, and he left for the city. The records of Bellevue Hospital show that the decedent was admitted to that institution May 28, 1889, suffering from alcoholism, and that he was discharged June 3d; that on June 5th he was admitted to Ward's island, and discharged the same day; that on June 25th he was again admitted to Bellevue Hospital, and was afterwards discharged; that July 28th he was again admitted to the alcoholic ward, and discharged the 29th, and was transferred to the Homeopathic Hospital on Ward's island, suffering from alcoholism and diarrhea. August 25th he was again admitted to the alcoholic ward, and on the 28th was discharged improved, the disease being alcoholism and chronic diarrhea.

The persistent indulgence for years in alcoholic stimulants has the effect to weaken the mind, and to make it susceptible to the influence of persons who may have improper designs against the person or his estate, and it is in this aspect only that the question of the decedent's habits is to be considered; for, as previously stated, I hold that he was competent at the time of the execution of the paper. The decedent had made two wills previous to the one now in controversy, one in 1886, in favor of Eugene Smith, which was produced and was shown to be in the handwriting of Smith, who states that it was drawn at the request of the decedent, and in accordance with his wishes, Subsequently, on March 22, 1887, while residing with Mrs. Reed in El Mora, a second will was drawn by an attorney, and duly executed, by which his estate was given to his nephew, John O. S., and his niece, Margaret Reed. Then, on the 16th of June, the will in question was executed, and by it Eugene Smith was again made the sole legatee. Smith states that this instrument also was drafted by him from instructions given by the decedent, and that from the draft the executed paper was copied. In the case of each will the motive for its execution seems to have been a sense of gratitude for kindness rendered. Smith and his parents had given him money from time to time, and purchased clothing for him. Mrs. Reed, though, paid for his support and maintenance in her house, and cared for him, but found the office a burden. He stated to Theodore E. Smith, the father of Eugene, that he was often furnished with liquor by Mrs. Reed at their home, and John O. S. Reed confirms the statement; but it is evident that they sought to regulate his use of stimulants, under the belief that it would be impossible to deprive him of them entirely, and it is probable that, under a sense of obligation for their kindness, he made a will in favor of John O. S. and Margaret Reed. I am convinced that he knew the necessity of being under influences that, if possible,

would keep him from temptation. He was kindly treated by Eugene Smith and his parents, and he made a will in Eugene's favor. When in New Jersey, and receiving kind attention from Mrs. Reed and her son and daughter, he made another, making Mrs. Reed's children the legatees. He became impatient of the restraint which they rightly imposed upon him, and left their home, and went from bad to worse, until discharged from Blackwell's island, June 15th, and he came at once to Eugene Smith, who cared for him and advanced him means, and then, with the same motive, he executed the will in question in Eugene's favor. When, a year later, he applied for admission into Mrs. Reed's house, if he had been accepted, it is probable that he would have made still another will, in favor of his nephew and niece.

I find nothing in the case to sustain the allegation of undue influence in respect to the execution of either instrument, except that the wills of 1886 and June 15, 1887, were written by or under the direction of the sole legatee. But the declarations of the decedent subsequent to the making of the will in contest, extending over a period of two and a half years, show that the paper conforms to his wish. He told Wendell in September, 1888, that he had made a will in favor of Smith. He made the same statement to Mayer, and expressed his gratitude for the kindness Smith had shown him. To Mrs. Smith, his sister, and the mother of Eugene, he made a similar statement. Whatever presumption of undue influence existed by reason of the legatee being the draughtsman of the will, under which he takes the entire estate, has been removed. A decree admitting the paper to probate may be presented.